Argued at Pendleton March 4; affirmed June 9, 1942

## In re Shanks' Estate
## SHANKS et al. *v.* SHANKS et al.
(126 P. (2d) 504)

Before Kelly, Chief Justice, and Bailey, Lusk, Rand and Brand, Associate Justices.

*E. R. Ringo*, of La Grande, for appellants.

*H. E. Brady* and *Colon R. Eberhard*, both of La Grande (H. E. Brady and Cochran & Eberhard, all of La Grande, on the brief), for respondents.

BAILEY, J. This is a will contest. The county court of Union county held the will invalid. On appeal to the circuit court the order of the county court was reversed and the will was declared valid. The contestants have appealed.

On August 1, 1938, Richard A. Shanks executed an instrument purporting to be his last will and testament. At that time he was, presumably, under fifty years of age. He was, and for many years prior thereto had been, a resident of La Grande, Oregon. By the terms of the document the testator bequeathed to his mother, Effie Shanks, of Rogersville, Tennessee, if living at the time of his death, the sum of fifteen dollars per month during her lifetime but in no event to exceed the total sum of eight hundred dollars. He also bequeathed to her the additional sum of one hundred dollars as funeral expenses and one hundred dollars for a headstone. He bequeathed to his sister the sum of five hundred dollars if living, or, in the event of her death, to her daughter; and a like amount to his brother, or, in case of his death, to his children. All the rest, residue and remainder of his property he devised and bequeathed to his wife and two minor children.

Richard A. Shanks died September 2, 1939, thirteen months after the execution of his will. The will thereafter was admitted to probate in common form. The testator's widow was appointed and qualified as executrix.

On September 21, 1940, within one year from the time of admission of the will to probate, this contest

was initiated by the widow and the two minor children by the widow as their guardian *ad litem*, against Effie Shanks, mother of the testator, and Neal W. Shanks and Laura J. Mooney, brother and sister, respectively, of the testator.

The will was attacked on two grounds, one of which was that the witnesses whose names appear on the instrument did not sign it in the presence of the testator. This claim apparently was abandoned. The remaining and only cause of contest is that on the day the purported will appears to have been executed "and for a long time prior to the said date and continuously down to the death of said decedent, said decedent was not competent to make a last will and testament because of insanity and unsoundness of mind", and that therefore the instrument is not a valid will.

The decedent was a veteran of the first World war and had certain disabilities for which he received compensation from 1928 until his death, at first at the rate of thirty dollars, and later fifty dollars a month. He was married to Lois F. Shanks in 1925 and as issue of that marriage two daughters were born, who were eleven and ten years of age, respectively, at the time of his death. For many years the decedent had been employed by the Union Pacific Railway Company as a fireman, at a wage of eight to ten dollars per day, but had not been engaged in active service as a fireman during the last two or three years of his life, although he acted as local chairman of a railway brotherhood, for which service he received between four hundred and five hundred dollars a year.

His estate was appraised at $6,550, all of which except $600 consisted of real property. One of the parcels of realty was residential property at La

Grande, appraised at $2,250. On this there was a mortgage of $800. The remainder of the real property was located in the city of Baker, Oregon, and consisted of three tracts of land, on one of which were a garage and a filling station, and on each of the other tracts, a filling station. The gross monthly income from the Baker property was said by one witness to be approximately $100. The widow of the decedent stated that the net income from that property for the year immediately preceding the trial was $247.27, after deducting the entire cost of a pump that she had installed during that year.

The decedent had life insurance in the railway brotherhood in the sum of $4,500. Whether it was payable to his widow or to his estate does not appear. Upon the death of Mr. Shanks his widow became entitled to receive from the federal government as long as she might live or until she might remarry, the sum of $30 a month for herself and in addition $8 a month for one child and $4 for the other, to be paid for the benefit of each child until she should reach the age of eighteen years.

In addition to the real property listed in the inventory of the estate, the widow held in her own name title to a piece of residential property at La Grande. The record does not show the value thereof or how Mrs. Shanks acquired it. She testified that she received a monthly rental of ten dollars from residential property in that city.

The testimony of Effie Shanks, mother of the decedent, was taken by deposition. She stated that she was sixty-seven years old; that she had no property of her own and was wholly dependent upon her children for support; that the decedent had contributed to her

support since he was a boy; and that: "If I was sick and in the hospital he would send more money, has sent as much as $150 at a time, but when I was well and able to be up he would send me money every few weeks, about $10 at a time."

The decedent's brother, Neal W. Shanks, also testified by deposition. He stated that he was forty-nine years of age and that his "approximate annual income is $1,500." The financial condition of the decedent's sister is not disclosed.

Richard A. Shanks died from cancer of the bladder. He had suffered from that disease for about five years, but was not aware of the nature of his ailment until about four years before his death and did not begin treatment for it, according to his widow, until approximately three years before he died. He went to Portland numerous times for treatment, at first for only a few days' stay and not at any time for more than ten days or two weeks, until December, 1937, when he underwent a major operation. He then remained in the hospital for about two months. Thereafter he did not return to Portland until May 15, 1939, at which time he became a permanent patient at the United States Veterans' hospital, where he remained until his death.

For many years the decedent had suffered from facial neuritis, which came upon him suddenly and disappeared in the same manner, although it sometimes lasted for hours. From the time she first knew him, his widow testified, to relieve the pain caused by the neuritis he had taken codeine tablets or capsules, which she understood to be not habit-forming. Mr. Shanks also suffered acute pain at times from passing small kidney stones.

In 1936 Mr. and Mrs. Shanks executed separate wills, which were prepared by Hugh Brady, an attorney of La Grande. Sometime prior to August 1, 1938, the decedent called at Mr. Brady's office, told the attorney that his doctors in Portland "held out no hope for his recovery," and requested Mr. Brady to "change his will," which the attorney did. Mr. Shanks took a draft of the new will from the office and in a few days returned with it, suggesting that it be changed in some respects.

Mr. Brady then dictated the will to his stenographer, Miss Foley, who typed it. When the attorney found that the testator wanted to execute it as rewritten, he left his office to obtain witnesses and procured Roy A. Farnam, a merchant, and Willard McMurren, a chef from a nearby hotel, to act as witnesses. The will was signed by the testator in the presence of those witnesses, who then signed it in the testator's presence. Mr. Farnam had known the testator for two or three years, although the other witness had never previously met him. McMurren testified that Mr. Shanks appeared normal to him in every way. Farnam stated that he knew that Mr. Shanks "had been away to the hospital, but had not noticed any change in him"; that he had never had occasion to question the testator's mental condition; and that the effect of his illness was not obvious.

Miss Foley, who had had about two years' experience as a stenographer and had been in Mr. Brady's office some eight months prior to the execution of the will, stated that Mr. Shanks had been in the office on several occasions concerning the will. Asked if she remembered him, she answered: "Barely, — as a big man, is all." She testified that there was nothing irregular about making the will.

Prior to drawing the will, Mr. Brady had acted as attorney for Shanks for some years, and when Shanks came to his office to consult him about his last will he came alone. Brady testified that the testator was, in his opinion, competent to make a will.

Up to a short time before his death Mr. Shanks transacted his own business. He attended to the leasing of his property in Baker, the collecting of rents and the assembling of material for his income tax statements. He also acted as local chairman of the railway brotherhood. In this connection, his wife did his typing, and during the "last year or year and a half" he was also aided in his work by a member of the brotherhood.

Before his operation in 1937 the testator visited, about every two years, his mother and other relatives in Tennessee. It does not appear whether his wife and children accompanied him every time. In 1938 and 1939 his brother, Neal W. Shanks, came from Tennessee to visit him. The latter such occasion was early in August, 1939, when the testator was in the hospital in Portland. At that time he called to see the testator on three different days. He found then that his brother's memory was good and he seemed to be entirely normal.

The evidence of the contestants to prove insanity of the decedent consisted principally of testimony of the widow and of two physicians of La Grande.

Dr. C. L. Gilstrap, who had been practicing medicine since 1927, had attended Mr. Shanks from about February or March, 1936, "up until the time he died, with the exception of the periods he was in Portland. * * * At times I would see him every day, and at times I wouldn't see him only once a week, or possibly

every two weeks'', as the decedent's condition required. After he had described the testator's ailment, Dr. Gilstrap answered a hypothetical question that was based largely on the testimony of Mrs. Shanks. He gave as his opinion, from the facts stated in that question, that Shanks was insane during the eight-year period covered by the question. He expressed no opinion from his own observation and treatment of Mr. Shanks, as to the latter's mental condition. He testified that he knew personally some of the facts mentioned in the hypothesis stated to him. One such fact was that Shanks was afraid to die alone; that ''he gave serious consideration'' to ''taking some of the family with him—killing some of the family''; and that he, Dr. Gilstrap, had sent the decedent to the Veterans' hospital in Portland ''in order to get him out of town for fear he might kill some of the family.'' Dr. Gilstrap did not specify the time when the decedent began to express such ideas. According to Mrs. Shanks, it was not until about the last year of her husband's life that she was in fear of him.

Dr. Gilstrap also testified that he knew that Mr. Shanks worried ''quite a lot about money matters.'' On cross-examination he gave the following testimony:

''Q. Dr. Gilstrap, I understood you to say that when he would be suffering from pain, he might suffer mentally as well?

''A. That's right.

''Q. And when he wasn't suffering from this pain he would have normal intervals?

''A. At times, yes.

''Q. What was his condition on the first day of August, 1938?

''A. I don't know—I could look up my records on the thing.

"Q. But you can't testify as to his particular condition on that particular day?

"A. No.

\* \* \*

"Q. Now, Doctor, presuming that Mr. Shanks knew that he was going to die, and that he had under those circumstances studied considerable about his will and had the provisions firmly fixed in his mind, presuming this, during one of these lucid intervals, one of these clear intervals when he was free from pain, could he have intelligently made a will—on one particular day?

"A. I think so."

The other physician, Dr. A. L. Richardson, had been practicing about forty-seven years. He had not personally known Mr. Shanks. His opinion, based entirely on the details stated in the hypothetical question that was also asked Dr. Gilstrap, was that the testator was insane during the whole period of eight years covered by the question.

The record is entirely silent as to the special qualifications of either of these physicians as an expert on mental conditions. No objection on that ground, however, was interposed to the testimony of either. The hypothetical question asked both physicians did not mention the kind of work that Mr. Shanks had been able to do during the period in contemplation. Many other facts were likewise omitted. And numerous incidents recited in the question that formed the basis of the physicians' opinions had not occurred until much later than eight years prior to the testator's death.

Mrs. Shanks also expressed the opinion that her husband was insane during the entire period that he was ill. The first incident she relates as indicating insanity occurred about eight years prior to his death, when her husband pointed out to her a man who, he said, was a government agent; and thereafter he also

pointed out "other persons" whom he claimed to be government agents, and on such occasions told her to "speak very low or they would overhear" her. He had no reason to think that such people were government agents, she stated, and she was not at such times saying anything that would in any way involve or embarrass him.

She also testified that her husband always exaggerated the amount of his wealth, at times claiming that it was as much as $40,000. At various times when he visited his relatives in the East he was very generous with his money. How much he gave or spent on those occasions is not revealed. He did, numerous times while at home, send checks to his relatives.

For a period of seven years, Mrs. Shanks testified, her husband was "very difficult to please". Although she did everything that he asked her to do, "Only once or twice did he express any praise or appreciation, that's all, to me." He did show letters to her that he had written to his relatives, in which he said that his wife "was being very kind to him—and doing everything I could for him".

When the testator's second daughter was born, according to Mrs. Shanks, he was very much displeased because the child was not a boy. Thereafter, "He would give things to the older girl, but leave out the little one." Later, when they were visiting in the East, the testator's mother noticed his lack of interest in the younger child and "scolded him for it". After they returned home, Mrs. Shanks added, "Well, then he turned around and favored the younger one." She further testified that her husband did not pay any attention to any request made by his daughters. Yet she later stated that he wanted them both to have a

college education because that had been denied him and he felt the lack of it.

According to Mrs. Shanks, the decedent made complaints about the cost of maintaining a home and rearing the children, and "it seemed to be a continual surprise to him every month when we had to pay the bills." He was not, she said, liberal in his allowance to her for household expenses. When her husband was in Portland he sent for her and on her arrival insisted that she stay at the home of some one with whom he was acquainted but she was not, in order to avoid expense.

Mrs. Shanks thus related the remarks of her husband on one occasion when she visited him in a Portland hospital after he had undergone a major operation:

"Well, I kept telling him how well he was getting along, and he said, 'You just think that,' he said, 'I am not at all—there are people looking at me all the time, faces of people on the bricks outside the hospital window, and I see them all the time.' He said, 'I close my eyes, and then I try to open my eyes, and when I open them, there they are again—you must think I am well, but I am not.'"

Asked whether her husband at that time had taken an opiate, she answered:

"Well, that was after he was operated on. That was—I presume he had had one then. It was after they operated quite a few times. I don't know whether he had or not."

She testified concerning another incident, which occurred, she said, immediately preceding an operation upon the testator: She visited him in the hospital, wearing a rust-colored dress, and he berated her "for getting a dress of that color—said I was figuring on his dying, and was celebrating with a red dress."

When Shanks was with his family and no strangers were present, Mrs. Shanks stated, he was cranky and cross, "worse some times than others", but when any outsider was present, the testator "was always very pleasant" and "very sweet". Mrs. Shanks further testified that in his conversation the testator would change from one subject to another without any apparent reason.

We shall not attempt to recite all the testimony given by Mrs. Shanks to bolster up her claim of the testator's insanity and the irreproachability of her own exemplary conduct toward her husband. Altogether it has the familiar sound of evidence in divorce proceedings rather than a showing to establish the incompetency of a testator.

Mr. B. B. Collins, a witness called by the contestants, testified that he had known the decedent all his lifetime. At the time of the trial this witness was a harness maker, although he had formerly been employed by the railway company. In one of the conversations he had with Shanks, he stated, the latter "suddenly straightened up and said, 'I'm not afraid to die.' " At another time, continued the witness, when he and Shanks were talking about the work that Shanks was doing as local chairman of the brotherhood, Shanks remarked, "If it wasn't for this work, I would go screwy." Mr. Collins further testified that he saw Shanks two or three times a month "immediately prior to the time he went to the hospital". He then gave the following testimony:

"Q. Did he always seem to be in pain?

"A. Well, no, not all the time, he wasn't—times he was, and times he wasn't.

"Q. At times he would be his normal self?

"A. Yes.

Mr. S. G. Coleman, another witness for the contestants, was the member designated by the firemen's organization to assist the decedent in his work as brotherhood chairman. During the testator's illness, this witness said, suggestions were made to him in regard to applying for a fireman's pension. He declined to apply for one, stating that "he was getting along now, and didn't want to apply for this pension" for the reason that "he was getting a small pension, and his ideal [idea] was, or the way he put it to me was, he didn't want the government to know that he was getting another pension; that was the ideal [idea] he give to me." At one time Shanks told him, this witness testified, that he had $10,000 in postal savings when he had only $1,000. Mr. Coleman did not remember hearing Shanks criticize his wife or say that she was spending too much money. Shanks was reluctant, according to Coleman, to name his ailment or indicate its exact nature. At one time when they were discussing his illness, the testator observed: "In this illness of mine, science sometime will probably find a cure for it, but it will not be during my time."

■■ The burden of proof of competency of the testator is upon the proponents of the will, but they have the benefit of the presumption that he was competent to make the will, inasmuch as it was executed in due form: *Morley v. Silverton Hospital*, 138 Or. 75, 95, 5 P. (2d) 92, and cases therein cited. There is also a presumption that every testator is sane: *In re Will of Robert Carr*, 121 Or. 574, 580, 256 P. 390.

■■ An important factor in determining the competency of the testator to execute a will is proof of his business ability: *In re Finkler's Estate*, 3 Cal. (2d) 584, 46 P. (2d) 149; *In re Nolan's Estate*, 25 Cal. App. (2d)

738, 78 P. (2d) 456; *Stevens v. Myers*, 62 Or. 372, 391, 121 P. 434, 126 P. 29. The expert testimony of physicians called by the contestants, predicated as it is upon a hypothetical question based almost exclusively on the observations and testimony of an interested non-expert witness, is of slight probative value: *Copenhefer v. Powers*, 137 Or. 145, 150, 300 P. 505.

■ The real question here involved is whether the mind and memory of the testator were sufficiently sound to enable him to know and understand the business in which he was engaged at the time of executing the will. We are of the opinion that at the time he did execute the will Richard A. Shanks knew the nature and amount of the property he owned and to whom he desired to leave it upon his death. He was, we believe, in every way competent to dispose of his property by will at the time he executed the document here in question.

Although Mrs. Shanks testified that the decedent seemed to her insane during the last seven or eight years of his life, nevertheless during the greater part of that period he was employed as a railway fireman, transacted his own business and cared for his family. He owned an automobile and she was entirely willing for him to operate it with herself and the children in the car. In 1936 she accompanied her husband to an attorney's office where both she and he executed separate wills, without protesting that he was insane or incompetent. She did nothing toward having a guardian appointed to take care of his property, nor did she take any other step usual to a wife who believes her husband to be mentally unsound. There is no evidence that while the testator lived she expressed any opinion to others that he was insane or unbalanced, except her possible utterances to Dr. Gilstrap during the last year

of her husband's life. In referring to testimony given by Mrs. Shanks concerning her husband's seeing faces on the wall, Dr. Richardson stated that the delusion might have been caused by some opiate given to the decedent to relieve his pain. Furthermore, since Dr. Gilstrap did not indicate the time when he sent Shanks to the Veterans' hospital so that he would not harm his family, it is not unreasonable to assume that he had in mind the time that Shanks entered the hospital as a permanent patient, May 15, 1939, some nine and one-half months after he executed his will and after his suffering had become intense. The testator's last previous hospitalization had been in December, 1937, and he had returned to his home in February, 1938.

In view of the fact that the decedent no longer had the income which he had formerly received as a railway fireman, it is not surprising that he worried about household expenses and that he wanted his wife to keep down the cost of her board and lodging when she was in Portland. Mr. Shanks was not unintelligent in wishing to avoid jeopardizing his disability pension from the federal government by applying for another pension from the railway brotherhood. He is not here to explain his remarks as quoted by his wife, yet it is possible that at some particular time he believed, and not altogether without reason, that as the recipient of a pension he might be under surveillance.

All the testimony, particularly that of the widow herself, shows the testator to have been in a most pitiable plight, at times suffering unbearable pain, knowing that he was about to die and trying to adjust himself to that fact. It is not to be wondered that he made provision in his will for his mother, whom he had helped to support since his boyhood; or that he

gave small bequests to his brother and sister, for whom he apparently had much affection.

The conclusion which we have reached, that the instrument here under attack is the last will and testament of Richard A. Shanks, deceased, is amply supported by the following authorities: *Ames' Will*, 40 Or. 495, 67 P. 737; *Holman's Will*, 42 Or. 345, 70 P. 908; *Pickett's Will*, 49 Or. 127, 89 P. 377; *Stevens v. Myers*, supra; *Collins v. Long*, 95 Or. 63, 186 P. 1038, 8 A. L. R. 1370.

The decree appealed from is affirmed. No costs will be allowed in this court.