Argued March 17; reversed June 21, 1949

# EVANS ET AL. *v.* ANDERSON
207 P. 2d 165

*George P. Winslow,* of Tillamook, argued the cause and filed a brief for appellants.

*William G. East,* of Eugene, argued the cause and filed a brief for respondents.

Before LUSK, Chief Justice, and BRAND, ROSSMAN, KELLY and BAILEY, Justices.

BAILEY, J.

This suit was brought by M. E. Evans, Ada West and M. E. Evans, as administrator of the estate of Lucinda Lemon, deceased, against Rita E. Anderson and Henry W. Anderson, her husband, for a decree canceling and setting aside a deed from Lucinda Lemon to Rita E. Anderson, dated April 26, 1945, for Lots 1 and 2, Block 24, College Hill Park, Eugene, Lane County, Oregon, and requiring Rita E. Anderson to account for any and all rents and profits received by her from said property and for all money received by her from Lucinda Lemon after on or about April 26, 1945.

The complaint alleges that defendants, Rita E. Anderson and Henry W. Anderson, are husband and wife; that on and for some time prior to April 26,

1945, Lucinda Lemon was a resident of Eugene, Lane County, Oregon, and was on that date the owner of the real property hereinbefore described; that she died on April 8, 1946, while temporarily residing in the State Hospital at Salem, Oregon; that at the time of her death she was a widow and left surviving her, as her sole heir at law, M. E. Evans, a son, Ada West, a daughter, plaintiffs in this suit, and Rita E. Anderson, a daughter, one of the defendants in this suit, all over the age of 21 years; and that M. E. Evans is the duly appointed, qualified and acting administrator of the estate of Lucinda Lemon, deceased.

The complaint then alleges that on or about April 26, 1945, Rita E. Anderson procured Lucinda Lemon to execute and deliver to her a deed of conveyance of the above described real property and that thereafter said purported deed was recorded in the deed records of Lane County, Oregon; that at the time said deed was executed, and for some time prior and subsequent thereto,

"the said Lucinda Lemon was, due to old age and physical infirmities, being then over the age of 70 years, of unsound mind to such an extent as to be wholly incapable of transacting business and never knew to the day of her death that she had made such a deed and on several occasions thought and advised other persons that she still owned said lands and retained control thereof until her death as aforesaid; that at some time prior to on or about April 26, 1945, the defendant, Rita E. Anderson, caused the said Lucinda Lemon to be removed from her home aforesaid and placed in the home under the control of certain relatives of said Rita E. Anderson, thereby obtaining complete and absolute control and domination over the person of said Lucinda Lemon; that the said Rita E. Anderson

paid no consideration whatever for the deed but well knowing her mother's condition and that she was not then and there capable of transacting business or of comprehending the nature and effect of signing and acknowledging said purported deed of conveyance, * * * and taking advantage of her close and intimate relation and absolute control and domination of her said mother, procured her to execute and deliver said purported deed without the knowledge of her said brother and sister, * * *"

It is further alleged that Rita E. Anderson has, since on or about the date of the execution of said purported deed of conveyance, collected and received rents and profits from said real property in an amount unknown to the plaintiffs, and has received of and from Lucinda Lemon sums of money in an amount unknown to plaintiffs, which she has appropriated to her own use and refuses to account for the whole or any part thereof to the plaintiffs.

Defendants, in their answer, admit that on April 26, 1945, Lucinda Lemon was a resident of Eugene, Oregon, and was on that date the owner in fee simple of the real property hereinbefore described; that Lucinda Lemon died on April 8, 1946; that M. E. Evans is administrator of her estate; that M. E. Evans, Ada West and Rita E. Anderson are her sole heirs at law; that each of said heirs is over 21 years of age; that defendant, Henry W. Anderson, is the husband of defendant, Rita E. Anderson; that on or about the 26th day of April, 1945, Lucinda Lemon executed and delivered to Rita E. Anderson a deed of conveyance of the real property hereinbefore described; that said deed was duly recorded in the office of the County Clerk of Lane County, Oregon; and that, by virtue of said deed, defendant, Rita E. Anderson, is now in

possession of said real property, claiming to be the exclusive owner thereof, and refuses to permit the plaintiffs to have or share any part of such property. They deny each and every other allegation of the complaint.

For a further and separate answer defendants allege that on or about April 26, 1945, Lucinda Lemon ''for a valuable consideration and in further consideration of love and affection of the said Lucinda Lemon for the defendant Rita E. Anderson and as a partial gift executed and delivered to the defendant Rita E. Anderson'' a deed conveying the real property hereinbefore described. Defendants ask that plaintiffs' suit be dismissed.

The Court found that at the time of the execution of said deed

''Lucinda Lemon was, due to old age and physical infirmities, being then over the age of 70 years, of weak and unstable mind, and that for some time prior to and on April 26, 1945, the defendant Rita E. Anderson stood and was in a fiduciary relationship with her mother, and the said Lucinda Lemon was then and there and particularly at the time of the execution of the deed aforesaid under the control and domination of the defendant Rita E. Anderson; that the said Rita E. Anderson paid no consideration whatsoever for the deed and purported conveyance of real property thereby, and that the execution, acknowledgment and delivery of the aforesaid deed of conveyance was procured by the defendant Rita E. Anderson by the exercise of undue influence upon her mother aforesaid, and that said deed of conveyance was not the free and voluntary act and deed of the aforesaid Lucinda Lemon.''

The Court also found that defendant, Rita E. Anderson, was entitled to judgment for $375.33 against the estate of Lucinda Lemon, deceased. It entered a decree setting aside and canceling the deed from Lucinda Lemon to Rita E. Anderson and awarded Mrs. Anderson judgment against the estate of Lucinda Lemon for $375.33. Defendants have appealed from the whole of said decree.

The principal question for determination, on this appeal, is whether the execution of the deed here involved was the free and voluntary act of Mrs. Lemon. If it should be determined that the Circuit Court did not err in setting aside this deed, then there is presented the question whether Rita Anderson is entitled to recover from the Lemon estate a greater amount than that allowed by the Circuit Court.

The following is a summary of the evidence which is not in controversy: Mrs. Lemon's second husband, John Lemon, died in February, 1943, and from then until October of that year she lived alone on her property in Eugene. In October, plaintiff, M. E. Evans, generally referred to as Earl, came from the Veterans' Hospital at Roseburg, Oregon, and took up his residence with her. He had been a patient at mental hospitals over a considerable period of time. Meeda Frazier, one of the defendants' witnesses, was a niece of Lucinda Lemon and is a cousin of the individual litigants, other than Mr. Anderson. She and her husband, William T. Frazier, have resided in Eugene for many years and at all times have been on friendly and intimate terms with all the individual parties to this suit.

Mr. and Mrs. Frazier, on April 14, 1945, called at Mrs. Lemon's home. When Mr. Frazier knocked on

the door Mrs. Lemon opened it and handed him a written note reading as follows:

"Eugene Oregon

[month and day not legible] 1945

"Dear Meeda

"Just a few lines to let you know I am living a dreary life * * * Earl has crazy spell. I hate to part with him he wont let me talk with any woman to call them so I never have have chance You know hate to part to him I never have complained of him befor let Reta must hurry a move on I have no way to tell and call any way. Earl has the of mail so dont write to me"

On April 16, 1945, upon the verified complaint of Rita E. Anderson, Earl Evans was taken into custody by the authorities in Lane County, Oregon, upon a charge of insanity. A hearing was held and he was found sane and was discharged. While he was thus in custody Rita Anderson and William Frazier called at Mrs. Lemon's residence and took her to the Frazier's home in Eugene, where she stayed for about six weeks. Earl never saw his mother thereafter.

Lucinda Lemon, on April 26, 1945, executed the deed here in controversy. This property was located at 2210 Jefferson Street, Eugene. She was then 68 years of age. On the same day she also executed an instrument revoking the power of attorney which she had previously given to her brother, Hugh Kay. These two instruments were filed for record with the county clerk of Lane County on the day that they were executed. On the same day she also signed a notice directed to her son, Earl, notifying him "to quit, vacate and surrender to me", not later than ten days from the date of receipt of the notice, the premises, known as 2210 Jefferson Street, where she and Earl

were living on April 16, 1945. He moved therefrom on May 1, 1945.

Under date of June 3, 1945, Lucinda Lemon and Rita E. Anderson entered into an agreement with Jack C. Hackward and his wife whereby Mr. and Mrs. Hackward "shall live in the home of Lucinda Lemon at 2210 Jefferson St., Eugene", and they agreed to "perform all duties pertaining to the keeping of the home, cooking meals and doing laundry for Mrs. Lucinda Lemon." For these services they were to receive "free rent, free light, free wood and water, the Register Guard and twenty dollars ($20.00) per month to pay for board of Lucinda Lemon to be paid by Mrs. Henry W. Anderson." The Hackwards took possession of the property on or shortly after the 3rd of June, 1945, and Mrs. Lemon left the Frazier home and took up her residence with them. The Hackwards remained there until February 8, 1946, at which time Mr. and Mrs. Mersereau moved into the house. All the time that Mrs. Lemon lived with the Hackwards she appeared to have been well satisfied with the care and attention that she received. Mrs. Lemon, on March 2, 1946, was removed to the State Hospital, in Salem, where she remained until her death on April 8, 1946.

We shall now refer to the testimony of the various witnesses, some of which is not free from controversy. Earl Evans testified that his mother visited him at the Roseburg Hospital in May, 1943, and told him that he must get out as soon as possible because "she could not get along alone here in Eugene in her home"; that on October 12, he "presented to the board a letter from my mother pleading for me to come home and live with her * * *. Due to these letters I was released". He returned to Eugene on October 14, 1943.

He said that he and his mother never quarreled, and that while she lived with him she was well provided for and was happy. Concerning the general condition of his mother's health, he gave the following testimony:

"A. My mother was quite poorly when I returned from the hospital and during the eighteen months I could notice a gradual decline, both mental and physical. In September of 1944 she had a serious heart attack. From that date on both in mind and body seemed to even deteriorate more rapidly than they had previous to that.

"The Court: What was that date? A. It was in September of 1944. I imagine it was about the 14th that she had this attack, heart attack."

He further testified that "from September on she practically spent all her time either in her bed in the bedroom or upon the day bed in the front room. For days and days at a time she never dressed. * * * She constantly complained of being ill". He testified that Mrs. Anderson was at his mother's home September 14, 1944, and again on Easter Sunday, 1945. He said: "I didn't have a very good feeling towards Mrs. Anderson the second trip. The second trip my feeling was over entirely and the visit was not congenial. That was Easter Sunday, 1945."

Elmer D. Stone, son of Mrs. Ada West and grandson of Lucinda Lemon, was at the time of Mrs. Lemon's death living on her farm near Monroe, Oregon. He said: "I imagine I visited [Mrs. Lemon] more than all the others put together"; that he had never heard his grandmother complain of Earl, and that they seemed to get along well together. He testified that he visited his grandmother on or about April 23, 1945, when she was in the Frazier's home; that she "was very ill and didn't feel like talking very much." Asked what was

the condition of her health on April 23, 1945, Stone said: "Grandmother was very weak at the time and she talked to me. I started to mention her friends around Monroe that she had known and she just couldn't remember those friends. She said, 'Well, I have been away so long' and I could tell that she was very much upset." There was, he thought, "more or less of a strained relationship in the household", following what had happened to Earl. He said that his grandmother was well pleased with the care that the Hackwards gave her, and that she talked and seemed quite contented and happy. He further testified:

"Q. Well then, you would say that during the entire period that Hackwards were there you noticed nothing about your grandmother's condition which in any way indicated to you that she was mentally unbalanced? A. That's right."

He visited his grandmother while she was in the State Hospital at Salem. He said that she blamed the Mersereaus for her being at the hospital, and that she did not show any animosity toward Rita Anderson. Relating to his conversation with his grandmother while she was at the State Hospital, about the conveyance of her property in Eugene, Stone gave the following testimony:

"A. The first thing I asked her, after we talked awhile. I said, 'Grandmother, who owns the place at Eugene?' Well, she said, 'Well, I do, Child, of course.' She says, 'That's my home.' I might explain, she called me 'Child' sometimes. I hadn't grown up to her, I guess. I went ahead and said, 'Are you sure?' No, I said, 'Did you ever sign any deed for anybody?' She said, 'No, I did not.' She said, 'I wouldn't sign away my home.' I dropped the conversation right there for the time being and we went ahead and talked to her for I would say

ten or twelve or possibly fifteen minutes, and then she was going to go to her room. We walked around the hall and before she went into her room I said, 'Grandmother, are you sure you never did sign any deed to the place in Eugene?' She said, 'Not unless I did it when I didn't know about it.'

"The Court: Q. Did you tell her there was a deed on record? A. I didn't tell her that. It was in Mrs. Anderson's favor and I had just learned of it the day before. So I didn't tell her it was in her name. I thought it might make her feel bad."

Marguerite Stone, wife of Elmer D. Stone, testified that she accompanied her husband on almost every visit he made to his grandmother during the time that Earl was living with her, and that Mrs. Lemon never complained to her "of any treatment or conduct on the part of her son Earl." She stated that after the Hackwards left, and about ten days before Mrs. Lemon was taken to the State Hospital, she visited her in Eugene. We now quote from her testimony about the conversation she there had with Mrs. Lemon concerning the latter's property:

"Well, we were just talking about things in general and about my mother-in-law in California and about her son down at Frisco giving her a home to live in down there and she said, 'Well, she ought to have that home to live in'. She said, 'She and Earl have a right to it' and she said, 'They fight so much about my property', and she says, 'I wish I were dead.' She said she wished to divide it evenly. That's the words she said.

"Q. I understand in that conversation you were talking with her with respect to the Eugene property? A. Yes, sir.

"Q. And that she made the statement she wished she were dead? A. Yes, she said that quite often in the last three or four months before she passed on."

William Hugh Kay, hereinbefore referred to as Hugh Kay, a brother of Mrs. Lemon, testified that Mrs. Lemon had given him a power of attorney and that the only business he had transacted under it was the sale of some sheep and wool in 1943 or 1944. On direct examination he stated that he had seen Mrs. Lemon about every two or three weeks on his way through Eugene, and that the last time he saw her was in October, 1945. Asked what her physical condition was at that time he said: "Well, it was bad mentally and I think also physically." He said when she was "quite young" Mrs. Lemon was afflicted with St. Vitus dance, and "I think she had had that, maybe not quite so frequent but I don't think she ever did get over it." On cross-examination he testified that all his visits to his sister were prior to and during the time that Earl was living with her, and that he called on her "maybe three or four or five times" during the eighteen months that Earl was living with her. He further testified on cross-examination as follows:

"Q. Well, when was the last time you could positively say she showed any signs of the affliction which you referred to as St. Vitus Dance? A. Well, I hadn't been close to her any more than trips occasionally for a period of a good many years.

"Q. When was the last time? A. I couldn't tell you the exact last time I saw her have one of those spells as we called it.

"Q. Was it twenty-five or thirty or forty years ago? A. I wouldn't venture a guess, because I moved out of the town of Monroe in 1901 and came to town and they was on the farm. And she never had any spells at that time that I saw. I never did hear of any. * * *

"Q. I want to know when was the last time you saw her when she had one? A. I don't think I

have seen her have one of those spells that I can remember since we left the farm. That was about fifty years back practically.''

Mrs. Betty Porter testified that she had known Mrs. Lemon for a great many years, and that she visited at her home frequently. One of the visits was on the afternoon of April 15, 1945. She stated that her physical condition on that day ''wasn't very good'', and that her mental condition ''wasn't very good either I don't think.'' She testified that Mrs. Lemon ''told me that she wasn't capable of doing any business again. That she couldn't write letters, that she had to ask Earl to write for her. She says, 'I am half crazy.' That's her words to me.'' She stated that at times Mrs. Lemon talked irrationally and at other times she did not; that she had not seen Mrs. Lemon since she went to stay with the Fraziers; and that she recalled having a conversation with her subsequent to Easter Sunday, 1945, and prior to April 16 of that year, when Mrs. Lemon ''told me she gave Rita the abstract to take care of and she said, 'I am not going—I didn't sign it, sign anything away.' And she says, 'I am not going to as long as I am living', and she said, 'When I am through with the property they can do as they please with it.' That's word for word what she told me.''

Mrs. Vivian Carmichael and Mrs. Edna E. Nettleton, neighbors of Mrs. Lemon, both testified that Mrs. Lemon and Earl seemed to get along well together, that the house was clean and the yard kept neatly. We now quote from Mrs. Nettleton's testimony concerning the conversation she had with Mrs. Lemon about the sale of her property:

''Q. Did you ever have any discussion with her about selling the property? A. The last time

I was over to see her she was laying down in the bedroom and she asked me to come in there because she disliked the people living there very much. She was very unhappy with her, and they were really very coarse people. I said to her that she ought to sell this lot. 'You can get a good price.' She said, 'If I did, that would be only another thing to fight over.'

"Q. Your words to her were, 'Why don't you sell the lot?' A. Yes. And she said, 'If I did, that would be only another thing for them to fight over.' That's the last time I saw her."

It is very apparent that this conversation between Mrs. Nettleton and Mrs. Lemon was subsequent to February 8, 1946, and while the Mersereaus were taking care of Mrs. Lemon, for there is no evidence that she was unhappy or dissatisfied while living with the Hackwards.

J. C. Hackward gave the following testimony of a conversation he had with Mrs. Lemon about her property:

"Q. Mr. Hackward, do you recall a conversation that you had with Mrs. Lemon shortly after a visit at her home by Elmer Stone in which you discussed with her selling her property? A. Well, Elmer was there one evening and I wasn't home, but after I left. It was about an hour before he left—after he left that I came home. We were sitting out on the porch and my wife was getting supper and I was kidding her about how young she looked and what was doing for a living and I asked her why she didn't give Elmer the deed on the ranch. 'Give him the ranch, you don't want it.' I said, 'You are through.' I was kidding her about it. She said, 'Well, I think I don't give anybody any of my property, any of my lots or property.' She said, 'I am going to let them fight over it.'"

The foregoing witnesses were called on behalf of plaintiffs. We shall now refer to the testimony of defendants' witnesses. Mr. Frazier stated that he had lived in the same house in Eugene for 25 years; that he had been a commercial traveler, but had retired 18 or 20 months prior to the trial; that he had known Mrs. Lemon for close to 30 years; that during the year 1945 he visited Mrs. Lemon frequently; that during the year 1945 she appeared perfectly rational and there was nothing to indicate that she was mentally unsound; that some time in April, 1945, he and Mrs. Frazier called on Mrs. Lemon and when she opened the door she thrust into his hand the note hereinbefore quoted and told him to take it and read it; that he put it in his pocket and did not read it until he reached home; that after he read the paper he telephoned to Rita Anderson, who was then living at Tillamook, and that Mrs. Anderson reached Eugene the following day. He stated that "Mrs. Lemon had got in very bad shape. She was very much emaciated and very weak and we had to support her from the house out to the car." He helped Mrs. Anderson take Mrs. Lemon from her home to the Fraziers' home. In answer to the question why he took her to his home, he said: "Well, there wasn't anything else to do. The woman was in such bad physical condition that it was just a case of humanitarianism, to get her some place where she could be cared for, because she needed to be cared for." He further testified as follows concerning Mrs. Lemon's condition after she was taken to his home:

"A. Oh, after a few days why she recuperated very nicely and got able to take care of herself, wait on herself, come to the table.

"Q. And tell the Court what her condition was there mentally. Did she show any indication of

being at all unbalanced? A. Her mentality was just the same as I have always seen it.

"Q. Absolutely all right? A. Yes. * * *"

Mr. Frazier testified that Mrs. Lemon told him that she was afraid of Earl and did not want to see him anymore. He said that he was at home when the deed in question was executed by Mrs. Lemon. He stated that Mrs. Lemon said that she wanted to give Mrs. Anderson a deed; that Mrs. Lemon said "that Rita would have to take care of her anyway as long as she lived and she just as well give it to her and she wouldn't be bothered then with having to take care of it." He denied that Mrs. Lemon was, on or about April 23rd when Elmer Stone visited her at his (Frazier's) home, "in a hazy, confused condition". He said that some time after the Mersereaus started to take care of Mrs. Lemon her condition became very bad, and he explained her condition then as follows: "Well, Mrs. Lemon knew me very well. In fact, she was rather fond of me, but she thought that I was a banker from Monroe. She didn't know who I was. She asked the other ladies for information. She thought I was the banker from Monroe. She didn't know his name, didn't know my name. * * *"

Meeda Frazier testified that Mrs. Lemon "was weak and kind of crying and upset when she came" to her home on April 16, 1945, and that in a few days her condition became much better. She explained as follows the first time she heard about Mrs. Lemon making a deed to Rita:

"A. Well, Rita had been down town and she came home and I had been working around in the kitchen and when Rita came in I was in the room with her and she said, 'I have decided I want to

deed the place to you, being as you have to take care of me anyway.'

"Q. Would you say whether or not Rita just prior to that time had been talking to her at all? A. No, absolutely not.

"Q. Well, just tell the Judge what you thought about her mental condition at that time. A. It was very good.

\* \* \*

"Q. The Court: What time of day was it the deeds were executed, do you konw? A. At the noon hour, as I recall it.

"Mr. Winslow: Q. Now, after that, along in there, did you have any talk with Mrs. Lemon by yourself about this deed? Did she make any statement to you why she was giving Rita a deed to the property? A. Yes, after Rita came back home and it was recorded she said, 'You know I got to thinking things over and Rita is the only one ever did do anything for me and the only one that never asked me for everything and I want her to have it.' "

Mrs. Frazier stated that Mrs. Lemon told her that Earl "accused her of being illiterate and kind of harassing her and kept her worried and she got afraid of him."

Mrs. Rita Anderson testified that she "wasn't able physically to visit my mother from the time she moved into the little home here until I came to attend my stepfather's funeral in February 1943"; that she visited her mother in August, 1944, at a time when she was very ill. On that visit her brother Earl treated her very coldly and had very little to say to her. He stated: "I have no desire to talk". Mrs. Anderson stated that she had not visited her mother often during the years 1943 and 1944 because of the war, for the

reason that "we had no gas and had no tires and I was not well a good deal of the time." The next time she saw her mother was on Easter Sunday, April 1, 1945, at which time she says she was received cordially by Earl. Her mother was then sick physically but "perfectly rational mentally", and she was quite overcome by the recent death of her only sister, who was buried on that day. She said that much of their conversation on that day occurred in Mrs. Lemon's bedroom. Her mother told her that she had given her brother, Hugh Kay, a power of attorney "to collect for the payment of the sheep and that she didn't know whether it was a general power of attorney or not." Mrs. Lemon asked her daughter to find out whether the property was still in her name. While they were in the bedroom Mrs. Lemon, according to Rita's testimony, asked her to take the abstract of title for the property in Lane County with her for safekeeping. In order to avoid having Earl see Rita leaving the bedroom with the abstract, Mrs. Lemon tossed it out of the window onto the ground and Rita went outside, picked it up and put it in her cousin's car. Under date of April 5th of that year Mrs. Anderson wrote to the county clerk of Lane County asking if the property hereinbefore described was still in her mother's name and received a letter from him to the effect that it had not been transferred.

Mrs. Anderson next visited her mother on April 16, 1945. She came to Eugene pursuant to the request contained in the note which her mother had given to Mr. Frazier. She went to her mother's home with Mr. Frazier and got her and took her to Frazier's home. She testified that she heard her mother crying "as I neared the porch"; that she "was not crying as she

went to the car with us.'' She stated that her mother, at the time she was taken to the Fraziers' home ''was physically sick and overcome by witnessing this scene of the taking of her son'' but that her mental condition on that day was good and that her physical condition was greatly improved in a short time. Concerning her mother's handwriting, Rita testified that ''mother was not an educated woman. She often misspelled words and often left out words and you had to put in extra words to make out what she had said.'' Referring to the note that Mrs. Lemon gave to Mr. Frazier on April 14, 1945, Rita Anderson said: ''My mother wrote this note on April 14th under a great strain. Earl had been creating a great deal of trouble for her in the home. He was watching her. He would go to the door and stand. * * * she wasn't having visitors very much and she watched to get this letter written and she knew he was watching her and she wrote it at intervals in the bathroom. [Mrs. Frazier also testified that Mrs. Lemon told her that she had written this note in the bathroom at intervals.] She said, 'You know I can't write well and I wrote it in a hurry but I knew you could make out what I said.' ''

Mrs. Anderson gave the following testimony relating to the conveyance of the land in question to her by her mother:

''A. Of her own free will one afternoon when I had been in town and came back to the home she had been lying on the davenport and she sat up and said, 'Rita, I am going to deed my property to you because after all you are going to be stuck with all the bills.

''Q. Had you ever prior to that time suggested or intimated you would like to have a deed to it? A. I never suggested or intimated in any way,

shape nor form anything about a deed to her property. Her property was not discussed.

"Q. What else was said? Anything about paying the bills? A. Yes, she mentioned that we have all these bills to meet and if I would take care of her all the rest of her life and meet all the bills she was willing to deed me that home for part payment for taking care of her the rest of her life.

"Q. Were you willing to do that? A. I was willing to do that."

After stating that she thought she was financially able to take care of her mother because her husband was postmaster at Tillamook, receiving a good salary, and that she herself had a life certificate to teach school in Oregon, she said that she had gone to Judge Harris's office in Eugene and had the deed prepared. We quote further from Mrs. Anderson's testimony:

"Q. * * * Well, right there, too, Mrs. Anderson, was there anything further said about money of your mother's that she had in the bank? A. Yes, mother had a small amount of cash in the bank and she said she wanted to turn that money over to me because she didn't want to be responsible for writing checks and paying bills and she asked that I take such money and add it to my account and use it for paying for things that needed to be paid for.

"Q. What did she do in relation to giving you a check? A. My mother gave me a check and I deposited it.

"Q. How much? A. Eight hundred dollars."

The record of the First National Bank of Eugene, Oregon, shows that on January 18, 1945, Mrs. Lemon had on deposit in that bank the sum of $900, that $800 was withdrawn from that account on April 26, 1945, and that on May 28, 1945, there was added thereto the sum of $138.24, which amount Mrs. Anderson stated

that her mother had withdrawn from the Monroe Bank and had deposited in the First National Bank of Eugene. Mrs. Anderson said that on or about February 21, 1946, her mother signed a check for $200 made out by and payable to Mrs. Anderson.

Mrs. Anderson testified that she had prepared the agreement hereinbefore referred to whereby the Hackwards were to "live in the home of Lucinda Lemon at 2210 Jefferson St., Eugene" and take care of Mrs. Lemon. The agreement was signed by the Hackwards and by Mrs. Lemon and Mrs. Anderson. In answer to the question why she, in the agreement, had referred to the place as "Mrs. Lemon's home", Mrs. Anderson said:

" * * * My mother had built that little home and paid for it. She had prior possession and it was referred to as 'her home' because it was to be her home her lifetime, even though she had deeded the property to me."

Mrs. Anderson testified that she had procured the Hackwards and Mersereaus to take care of her mother and had paid them for their services; that she had fully performed her agreement with her mother to "take care of her all the rest of her life and meet all the bills." She testified that she sent her mother Christmas presents, "I provided for my mother all the little comforts and luxuries I could afford. I bought her all of the nice things she had for using in her home, her clothes—do you want me to enlarge on it? Clothes, dishes, cooking utensils, bedding, all of the luxuries, such as perfume, nice gloves, warm sweaters. * * * I have been doing those things for my mother ever since I had had my first money and my first earning powers. Ever since I was eighteen years of age."

Rita Anderson stated that she was called to Eugene on the 22nd day of February, 1946, because of her mother's illness. ''I was greatly shocked and surprised to find my mother suffering from hallucinations. * * * She had arrived at the idea that she was suffering from an incurable disease and that I must not touch her.'' She stated that Mrs. Mersereau had summoned a doctor, and that the doctor told her (Rita) that her mother ''was having these hallucinations and that she was in a paranoiac condition and that she might become better and that she might be worse.'' Later, at the suggestion of the attending doctor, Mrs. Lemon was placed in the Oregon State Hospital on March 2, 1946, where she died a few weeks later, on April 8.

Henry W. Anderson testified that he had lived in Tillamook all his life and had been employed in the postoffice there since 1920. At the time that he testified he was postmaster. He stated that he had visited Mrs. Lemon during the time that the Mersereaus were caring for her, and that Mrs. Lemon said to him: ''Well, you have never seen the place; Rita, why don't you take him out and show him around the place.'' Rita showed him around the premises, and he said ''when I came back in, she said 'Well, how do you like our little place?' I said 'I think you have got a very lovely home here'. She said 'Well, do you like it up here?' I said 'yes, I do'. She said 'Well, maybe you and Rita want to live here some day'. She said 'You know I have given it to you.' ''

Harold Evans, a nephew of Mrs. Lemon and a cousin of the individual litigants, testified that he had lived in Berkeley, California, since 1939; that in the latter part of March, 1945, he came to Eugene to attend

his mother's funeral and while there visited Mrs. Lemon. He said that "she said nothing or done nothing which would lead me to suggest that she was not of sound mind. That is, she was of normal, rational conversation, no different than we had had over the long period of years." He visited his aunt again in June of the same year, and at that time he did not "notice anything about Mrs. Lemon's conduct or actions which indicated to" him "in any way that she was of unsound mind."

Mrs. Myrtle Hackward testified that, while she and her husband were living at Mrs. Lemon's home and taking care of her, Mrs. Lemon "waited on herself, dressed herself, made her own room and I had very little to do taking care of her.  * * * She took her own bath. I have helped her when she would wash her hair but she took her own bath." She further testified that during the eight months that she lived with Mrs. Lemon she did not notice anything about Mrs. Lemon's mental condition which would indicate that she was unbalanced in any way. She also testified that Mrs. Lemon referred to the place where she lived as "my home" and "my property".

Mr. Hackward was asked if he had noticed anything about Mrs. Lemon's conduct or actions that indicated to him "in the least that she was in any way unbalanced mentally", to which he answered, "Not a thing that I remember of or recall." He stated, "I had several conversations with her about the property. She always termed it, 'my property'."

Mrs. Marjorie Mersereau stated that, when she and her husband moved into Mrs. Lemon's home to take care of her after the Hackwards left, " * * * Mrs. Lemon was rather an old lady but she was well, both

physically and mentally as far as I could judge, very clear. As soon as she got the Register-Guard, the paper, at night she read it, and she always took care of herself. * * * She always took care of her own bath and dressed herself. I had nothing to do with her whatsoever.''

Mrs. Marie Byrom stated that she lived in Eugene and was, and had been for over 16 years, secretary to Judge Lawrence T. Harris; that she was a notary public; and that at the request of Judge Harris she had gone to the Fraziers' home to take Mrs. Lemon's acknowledgment to the challenged deed. She stated that when she arrived there Mrs. Lemon was in the living room lying on the davenport. She asked Mrs. Lemon if she had read the instrument, to which Mrs. Lemon answered that she did not have her glasses. Mrs. Byrom then said: ''So I read it to her. She asked me for a magazine or something to put the deed on and she signed it, and I called someone—I don't remember whether it was Mr. Frazier or Mrs. Frazier who brought a magazine. They went out of the room and she signed the deed and I asked her if she acknowledged it, if she signed it freely and voluntarily and she said she did.'' The witness testified that there was nothing about Mrs. Lemon's actions or conduct that indicated in any way to her that she was mentally unbalanced. The witness further testified that Mrs. Lemon also at the same time signed the revocation of the power of attorney, which revocation she read to Mrs. Lemon before she signed it. On cross-examination she gave the following testimony:

''Q. I was a little interested in the fact that when you got there in the home the people that were present all went out of the room. Was there any particular reason that you know of for that?

A. Yes. I always prefer that they leave. You know I have been in that business for quite a number of years and many times there have been questions about whether there was influence, and I specifically asked whether she realized what she was doing and if it was freely and voluntarily done, and there was no one there and she told me that it was.''

Mrs. Byrom was later recalled as a witness and testified as follows:

''Q. Mrs. Byrom, when you were at the Frazier home taking the acknowledgment on this deed I wish you would tell the Court about a conversation that you had with Mrs. Lemon just at the time or just prior to the time she signed the instrument, as to whether this deed was in the form that this witness wanted it or some other form. Tell what the conversation was. A. When I read the deed to her I asked her if she realized she was conveying the property and that she would no longer have any interest in it or any right to have anything to say about it, and she said yes, she did. And I said, 'Now, would you like me to take the deed back to the office and have Judge Harris put a provision in it to the effect that you are reserving a life estate?' And she said, 'No.' I said, 'You mean you want to convey the property?' And she said, 'I do.' And I said, 'Then you would rather make a deed than to make a will? She said, 'Yes', she wanted to do it that way because her daughter had always taken care of her; she knew she would continue to do so and that she wanted to make the deed so there would be no trouble after she was gone.

''Q. At this time I am also going to ask you whether or not in your opinion after what took place there Mrs. Lemon understood the nature and character of the business she was transacting and the importance of it? A. Well, I would definitely think that she did. Because I asked her two or

three times if she realized that she was absolutely conveying the property? And she said that she did, and I know I asked her twice if she was signing it freely and voluntarily and she said she was."

Mrs. Lemon had only a life interest in the ranch which she had leased to her grandson, Elmer Stone. The only other real property which Mrs. Lemon had was that which she deeded to her daughter, Rita Anderson. At the same time, as has hereinbefore been pointed out, she gave this daughter a check for $800. She had left $100 in the First National Bank of Eugene, Oregon, and $138.24 in the bank at Monroe. Later, and before she died, Mrs. Lemon gave Rita a check for an additional $200. It can therefore be said that Mrs. Lemon, by her deed and check of April 26, 1945, gave practically all of her property to her daughter, Rita. It was stipulated by the attorneys for the litigants that the reasonable market value of the property was $5,000 at the time of the trial and that in ordinary times it was one-half that amount.

Several witnesses testified that Mrs. Lemon had told them that she had not conveyed the real property here in question or that she was not going to convey it. Mrs. Betty Porter testified that she had a conversation with Mrs. Lemon between Easter Sunday and April 16, 1945, and Mrs. Lemon told her then that she was not going "to sign anything away", and that "when I am through with the property they can do as they please with it." This statement was made before Mrs. Lemon went to live temporarily at the Fraziers' home. Elmer Stone's conversation with his grandmother about the transfer of the property was while Mrs. Lemon was in the State Hospital, and Marguerite Stone's conversation with her was about ten days

before Mrs. Lemon was taken to the hospital. Some time prior to February 22, according to Mrs. Anderson's testimony, her mother had a nervous breakdown and was having hallucinations. The exact date when Mrs. Nettleton had her conversation with Mrs. Lemon concerning her property is not given, but it was apparently after the Mersereaus moved into the Lemon home.

The foregoing evidence, concerning statements attributed to Mrs. Lemon, is of little probative value due to the time and conditions under which the statements were made. Nor does the fact that Mrs. Lemon referred to this property as her home prove that she did not intend to convey it to her daughter, Rita, for it is apparent from all evidence that it was understood between Mrs. Lemon and her daughter that Mrs. Lemon was to have the use of the property during her lifetime. We are also unable to give much weight to Mr. Hackward's testimony relating to the statement Mrs. Lemon made to him about selling the property, for the reason that when she made that statement he was "kidding her about it." He testified: "I used to kid her quite a bit" and she "always had a comeback."

After the Hackwards took charge of Mrs. Lemon she wrote several letters. Elmer Stone admitted receiving at least two letters from her. There were introduced in evidence eight letters which Mrs. Lemon wrote to Mrs. Anderson between June 28, 1945, and January 26, 1946, and two letters which she wrote to Mrs. Frazier, one on December 31, 1945, and another on January 26, 1946. In none of these letters is there any indication that Mrs. Lemon was mentally unbalanced.

We think, from the record in this case, that a

fiduciary relationship existed between Mrs. Lemon and her daughter, Rita. At the time of the execution of the deed Mrs. Lemon was living at the Fraziers' home. She was in a weakened physical condition and was being cared for by, and reposed confidence in, her daughter, Rita. Such a relationship may exist in the absence of a trust or agency. *Rowe v. Freeman,* 89 Or. 428, 437, 172 P. 508, 174 P. 727.

■ Ordinarily, the burden of proving undue influence rests upon the party alleging it. However, where a fiduciary relationship exists between donor and donee, there is a presumption of undue influence and the donee is required to produce evidence sufficient to establish that the gift was the free and voluntary act of the donor and that the transaction was fair and equitable. *Gilliam v. Schoen,* 176 Or. 356, 363, 157 P. (2d) 682, and authorities therein cited. In *Bliss v. Bahr,* 161 Or. 79, 89, 87 P. (2d) 219, it is said: "It is not the existence of the confidential relationship alone that constitutes undue influence, but it is the wrongful use thereof which invalidates the conveyance". Citing numerous authorities. The Court then quotes the following with approval from 12 R. C. L. 953:

"A gift between persons occupying confidential relations toward each other is, if its validity is attacked, always jealously scrutinized by a court of equity, and unless found to have been made freely, voluntarily, and with a full understanding of the facts, will be invalidated. The existence of confidential or fiduciary relations imposes upon the recipient of a gift the onus of establishing its absolute fairness * * *."

■ In *Carr v. Ryan,* 121 Or. 574, 582, 256 P. 390, it is said: "Friendly advice or influence arising from gratitude, affection or esteem is not undue influence, nor

can it become such unless it destroys the free agency of the testator at the time the instrument is executed. Estate of Allen, 116 Or. 467, 499, 241 P. 996.'' See also *Wayne v. Huber,* 134 Or. 464, 471, 291 P. 356, 294 P. 590, 79 A. L. R. 1427. Undue influence must be such as effectually deprives the grantor of the exercise of his free will and to substitute another will for his own. ''Suggestion or advice by a friend or relative, or one in confidential relation, is not undue influence, if it leaves the mind free to act on its own judgment.'' In Re *Estate of Riggs,* 120 Or. 38, 63, 241 P. 70, 250 P. 753, and authorities therein cited. *Wayne v. Huber,* supra; *Thomas v. Johnson,* 183 Or. 405, 193 P. (2d) 534.

■ There is a presumption that Mrs. Lemon was sane at the time she executed the deed in question. In Re *Shanks' Estate,* 168 Or. 650, 662, 126 P. (2d) 504. The testimony of Mrs. Byrom, a disinterested witness, who took Mrs. Lemon's acknowledgment to the deed and who questioned her concerning it, is entitled to great weight and especially so when aided by the presumption of Mrs. Lemon's sanity. *McGreal v. Culhane,* 172 Or. 337, 341, 141 P. (2d) 828. Mr. and Mrs. Frazier were also disinterested witnesses. The preponderance of the evidence supports the defendants' contention that Mrs. Lemon was of sound mind at the time she executed the deed here under attack and that she executed the deed freely and voluntarily and not under the influence of the daughter, Mrs. Anderson, or anyone else. The preponderance of the evidence also supports defendants' contention that Mrs. Lemon deeded this property to her daughter, Rita, on the understanding that Rita ''would take care of her all the rest of her life and meet all the bills'', and for the

further consideration of love and affection of the grantor for the grantee. Mrs. Anderson fulfilled her part of the contract.

■ We are of the opinion that Mrs. Lemon was, at the time she executed the deed in question, of sound mind, and that she executed it freely, voluntarily, and with a full understanding of all the facts and circumstances. In view of our conclusion on this feature of the case it becomes unnecessary to discuss the matter of accounting which was raised by defendants.

The decree appealed from is reversed in its entirety and the cause is remanded to the Circuit Court with instructions to enter a decree dismissing the suit. Costs will not be allowed to either of the parties in this Court.

Mr. Justice Kelly died prior to the rendition of this decision.