Argued May 22, reargued September 5, affirmed September 26, 1951

# IN THE MATTER OF THE ESTATE OF RANDI ANDERSEN, Deceased
## POSTELLE and RUNNING *v.* SHUHOLM,
### AS EXTR'X, ET AL.

235 P. 2d 869

*Joe P. Price*, of Portland, argued the cause for contestants-appellants. With him on the brief was Stephen W. Matthieu, of Portland.

*W. J. Prendergast, Jr.,* of Portland, argued the cause and filed a brief for respondents.

HAY, J.

This is an appeal from a decree sustaining the will of Mrs. Randi Andersen, deceased, against a contest by Helen M. Postelle and Ralph G. Running, who are respectively niece and nephew of the testatrix, and

claim to be her sole heirs at law. The grounds of contest are lack of testamentary capacity and undue influence.

Mrs. Andersen was about 85 years of age at the time of her death. She was of Norwegian birth, but had resided in Portland, Oregon, for many years. Her husband predeceased her, and it does not appear that she had ever had any children.

At some time around midday on March 28, 1949, Mrs. Andersen, who had been in good health theretofore, suffered an attack of acute congestive heart failure. She was removed to Providence Hospital, where she remained until her death five days later. On March 29, 1949, she executed the will which is under attack in these proceedings.

The will made the following devises and bequests: A 40-acre tract of farm land in Clackamas County, Oregon, to Carlmer and Minnie Amundson, husband and wife; a residence property in Portland to Cecil Key and Mary Key, husband and wife; another residence property in Portland to Edna Lindberg, described in the will as testatrix's niece, but who is in fact her deceased husband's niece; testatrix's personal effects, household furnishings, and personal property situated in her home in Portland to Minnie Amundson, also described as testatrix's niece but actually her husband's; $1,000 to Anna Detwiler, of Seattle, Washington; $300 to Axel Monnes, of Portland; $100 to Evelyn I. Shuholm, of Portland; $300 to testatrix's nephew, Ralph Running, a contestant herein; $300 to testatrix's niece, Helen Postelle, a contestant herein; $500 to Ole Einangshaug, of Sona, Trondheim, Norway. Minnie Amundson was made residuary legatee, and Evelyn I. Shuholm was named as executrix, to act without bond.

It is alleged in the petition, in effect, that, at the time of the execution of the will, testatrix, by reason of illness affecting her body and mind, was lacking in testamentary capacity, and that the attacked instrument was not in fact her will but that she was caused to sign it through undue influence, dominion and control exercised over her by Minnie Amundson, a relative of hers by marriage.

Evelyn I. Shuholm, having been duly appointed executrix of the will, answered the petition by general denial, and affirmatively propounded the attacked will for probate in solemn form. Issue was joined by contestants' reply. A hearing was held before the probate court, and, on November 22, 1949, a decree was entered admitting the will to probate in solemn form and dismissing the contest. The contestants have appealed.

■ The elements of testamentary competency have been stated by us upon frequent occasions. We need not repeat them here. See § 18-101, O.C.L.A., as amended by ch. 136, Oregon Laws 1941; *In re Walther's Estate,* 177 Or. 382, 386, 163 P. 2d 285, and cases cited. The burden of proof thereof rests upon the proponent. *Holman's Will,* 42 Or. 345, 357, 70 P. 908; *Darby v. Hindman,* 79 Or. 223, 224, 153 P. 56; *In re Sturtevant's Estate,* 92 Or. 269, 276, 178 P. 192; *Brumbaugh v. Barber,* 135 Or. 392, 399, 296 P. 42.

The evidence shows that testatrix suffered a heart attack on March 28, 1949. Dr. Joseph Amato was called, and under his orders testatrix was removed to Providence Hospital, where she received the customary treatment for a patient in a condition of acute cardiac failure. She was in much distress. Her breathing was labored, and considerable torpidity of her circulatory system was indicated by marked cyanosis. By the

following morning, her condition, as testified to by Dr. Amato and one of the nurses, appeared to have improved. At about five o'clock in the afternoon, Dr. Amato conducted another examination. He thought that, in comparison with her condition in the morning, she had begun ''to slip again.'' He did not, however, visit her any further that day.

Evelyn Shuholm is a young woman of Scandinavian extraction. She is a law office stenographer of several years' experience. She appears to have been an intimate friend of the testatrix. At some time previous to her heart attack, Mrs. Andersen had made arrangements through Miss Shuholm to have Leo Levenson, a Portland attorney, call upon her for the purpose of advising her with reference to making a will, but, other matters intervening at that time, she canceled the arrangements. On March 29, 1949, Miss Shuholm asked Mr. Levenson to go with her that evening to the hospital so that Mrs. Andersen might confer with him in reference to drawing her will. They accordingly went to the hospital at about seven o'clock p.m. Mrs. Andersen was in a ward with several other patients. Mrs. Amundson was visiting her when they arrived. Mr. Levenson had not met either Mrs. Andersen or Mrs. Amundson previously, and Miss Shuholm introduced him to them. Mrs. Andersen took hold of Mr. Levenson's hand, held it with a very firm grasp for half a minute or so, and called him by his first name. She said that she was glad that he had come; that she had asked for him to come. There followed a general conversation lasting about three-quarters of an hour. Mr. Levenson testified that he deliberately caused Mrs. Andersen to be engaged in such general conversation, with the idea that she might demonstrate by intelligent

participation therein that she had testamentary capacity. The conversation was mostly between Mrs. Andersen, Miss Shuholm and Mrs. Amundson. Mr. Levenson for the most part listened, but did join in the conversation to some extent. During the general conversation, nothing was said about a will or about any business matter. Finally Mr. Levenson, having satisfied himself that Mrs. Andersen was "fully competent," said to her: "Now, Mrs. Andersen, if you want me to draft your will, you will have to tell me just what you have in mind." She thereupon began talking about her property. On Mr. Levenson's suggestion, Miss Shuholm took notes, partly in shorthand and partly in longhand, of Mrs. Andersen's instructions. He had those notes in court when he testified as a witness herein. Among other matters, Mrs. Andersen wished to devise a house and lot, situated immediately to the rear of her own home, to Cecile Key, a little girl about six years old, of whom she was very fond. Mr. Levenson suggested that if the parents were good people they might be depended upon to care for the child, and that it might be better to leave the property to them, thereby avoiding the necessity for involving it in a guardianship proceeding. This suggestion met with Mrs. Andersen's approval. She then talked about Ole Einangshaug, an old friend of hers in Norway, who had a family of children to support and was in necessitous circumstances, and for whom she desired to make some provision. Thereafter, she discussed the various bequests and devises which she had determined to make. She had a shopping bag under the table. She asked Mrs. Amundson to get the bag for her, handed it to Miss Shuholm, and asked her to open it. In the bag were many papers and deeds, and a

considerable amount of old paper money folded and tied with string. Mr. Levenson said that he would have to go to his office and prepare the will. Mrs. Andersen told him she wanted him first to go to her house and get some other papers and the addresses of certain of the beneficiaries, including Helen Postelle, her niece. She told him that she would arrange with the nurse to leave the door of the ward open so that he could have access to the ward when he returned with the will. Thereupon, Mr. Levenson, accompanied by Mrs. Amundson and Miss Shuholm, took the shopping bag and went to Mrs. Andersen's home on Mississippi avenue, where he procured the necessary papers and data. From there they went to Mr. Levenson's office, where Mr. Levenson, in the presence of the others, counted the money which was in the shopping bag, and found that it amounted to $3,890. There were also in the bag savings account books in various banks. Mr. Levenson then dictated the will to Miss Shuholm in accordance with the notes which she had made at the hospital, and Miss Shuholm typed it. Mrs. Amundson during that time occupied another room of the office. The will was completed at about a quarter past 10 o'clock, and Mr. Levenson and the two women thereupon returned to the hospital. The light was burning in Mrs. Andersen's ward, the door was open, and Mrs. Andersen was awake. They went in, and Mr. Levenson told Mrs. Andersen that he had the papers with him but that they would have to get witnesses. He said that he himself could be one, and Mrs. Andersen wanted to know why Miss Shuholm could not be the other. It was explained to her that Miss Shuholm was a beneficiary and therefore could not act as a witness. Mr. Levenson then went to the nurses' room on that floor,

where there were two nurses in attendance. He asked if either of them would care to be a witness to the will, but they said that it was against the rules of the hospital for a nurse to do so. He then met the Sister Superior, who upbraided him for coming there at that late hour, and said that no visiting was permitted after eight o'clock. Mr. Levenson explained that he was not a visitor, but was there on business. Thereafter, he went down to the main floor, where he talked with Mrs. Nellie Edmonds, a telephone operator employed by the hospital, who was just about to go on duty. Mrs. Edmonds agreed to act as a witness, and accompanied Mr. Levenson to Mrs. Andersen's room. Miss Shuholm then, at Mr. Levenson's request, read the will to Mrs. Andersen, first in English and then in Norwegian, paragraph by paragraph. After each paragraph had been read in English, she asked Mrs. Andersen in Norwegian if she understood it, and Mrs. Andersen each time responded: "Ja, that's what I want; that's what I want." Mr. Levenson then said to Mrs. Andersen: "Now, you will have to ask the two witnesses if you want them to witness your will. * * * Now, do you want me to be a witness to this will?" Mrs. Andersen said: "Ja." Mrs. Andersen then attempted to sign her name upon the will, but was unable to do so for the reason that the will was lying upon the bedclothes and she needed some firmer support for it. Mrs. Edmonds volunteered to get an aluminum chart board to place under the will, which she did. Mrs. Andersen then signed the will, and, upon Mr. Levenson's reiterated suggestion, asked him and Mrs. Edmonds to be witnesses. Thereupon they affixed their signatures to the will as witnesses. Mrs. Andersen then said: "Well, I feel much better now."

Mr. Levenson testified that Mrs. Andersen had entered intelligently into the general conversation which preceded the taking of her instructions in regard to drafting the will. Thereafter, she discussed with him the descriptions and location of her property and the nature of it. She told him about the deeds, some of which she had at the hospital and others at the house. In regard to her mental condition, he said: "Mentally she was alert; her eyes were keen; she had a good grip in her hand, a warm grip in her hand; she shook hands with me when I was there at seven o'clock; her mind functioned well; she answered questions without any hesitancy; her conversation that was going on was intelligent; her answers were intelligent; she smiled when we brought up something that was interesting to her." She carried on an extensive conversation with Miss Shuholm in broken English and Norwegian.

Mrs. Nellie Edmonds testified that she was not acquainted with Mr. Levenson at the time when he asked her if she would act as a witness. She accompanied him to Mrs. Andersen's room and Mr. Levenson introduced them to each other. There was a general conversation going on at the time, to which she did not pay much attention. The will was then read by Miss Shuholm section by section, first in English and then in a language which Mrs. Edmonds supposed to have been Norwegian. Mrs. Andersen asked Mrs. Edmonds if she would witness her signature. When the will was handed to Mrs. Andersen for her signature she said: "This is too soft; I've got to have something harder to write on." Mrs. Edmonds thereupon procured an aluminum chart board, and Mrs. Andersen, using that to support the will, signed it in the presence of both Mr. Levenson and Mrs. Edmonds, who there-

upon, in the presence of testatrix and of each other, added their signatures as witnesses. Mrs. Andersen seemed to be alert. In Mrs. Edmonds' opinion she knew what she was doing. The things that Mrs. Andersen said to her were perfectly lucid.

On behalf of the contestants, Dr. Joseph Amato, the attending physician, Dr. Wesley Wayne Hoskins, a resident physician at Providence Hospital, and several nurses who at one time or another were in attendance upon Mrs. Andersen, testified at length and in detail regarding Mrs. Andersen's physical and mental condition, and said that, in their opinion, she was not mentally competent to know and understand the nature and extent of her property or the persons who would be the natural objects of her bounty. Dr. Amato's testimony was based mainly upon Mrs. Andersen's condition at about five o'clock in the evening of March 29, 1949. Thereafter, at about eight o'clock p.m., a nurse administered to her one-sixth of a grain of morphine sulphate, to allay her restlessness, and the doctor gave it as his opinion that such a dose would have rendered it impossible for her to have had sufficient understanding to be mentally competent as of the time when the will was executed. Dr. Hoskins testified that he had talked with Mrs. Andersen on several occasions on the day she signed the will, and at no time received intelligent responses. Answering a hypothetical question, he said that, in his opinion, Mrs. Andersen, at the time when she signed the will, could not have understood the details of what she was doing and have judged with understanding and reason between one disposition (of property) and another; that her mind and memory could not have been sufficiently sound to have enabled her to know and under-

stand the business in which she was engaged and what disposition she wanted to make of her property.

Dr. Leland V. Belknap, an experienced physician and surgeon, testified as an expert witness. There was propounded to him a lengthy hypothetical question, involving most of the evidence which had been received respecting Mrs. Andersen's physical and mental condition and her surroundings before, at the time of, and subsequent to the execution of the will, and calling for his opinion based thereon as to her testamentary capacity. In response thereto he testified: "I don't think she at that time was mentally alert enough to know what was going on." However, on cross-examination, in answer to a hypothetical question even lengthier than the one before, involving the evidence from proponent's point of view, he stated that, assuming that everything in the question was true, he would not "say positively that that did not happen, could not have happened." From a plethora of questions, objections, arguments, and a very brief answer, we gather that the doctor meant that, if it was true that Mrs. Andersen took the active part in the preparation and execution of the will which the testimony of proponent's witnesses indicated that she did, she had testamentary capacity.

In a general way, the nurses corroborated the physicians' opinions as to Mrs. Andersen's lack of testamentary capacity. It is to be observed, however, that none of the physicians or nurses actually saw Mrs. Andersen at the times when Mr. Levenson talked with her or at the time when the will was read to her and executed by her, and that Dr. Belknap never saw her at any time.

■ The ultimate question to be determined, of

course, is whether or not the testatrix had testamentary capacity at the time when she executed the will. *Clark v. Ellis,* 9 Or. 128, 147; *In re Sturtevant's Estate,* supra, 92 Or. 269, 287, 178 P. 192; *Talbert v. Skilbred,* 125 Or. 545, 548, 267 P. 396; *In re Walther's Estate,* supra, 177 Or. 382, 388, 163 P. 2d 285. The evidence of the physicians and of the nurses as to her physical and mental condition before and after the time of the execution of the will was entirely competent in this connection. *In re Murray's Estate,* 173 Or. 209, 220, 144 P. 2d 1016; *In re Provolt's Estate,* 175 Or. 128, 133, 151 P. 2d 736. As against such opinion evidence, however, we have the unqualified statements of unimpeached witnesses of the existence of the facts evidencing testamentary capacity. *Pickett's Will,* 49 Or. 127, 152, 89 P. 377; *In re Sturtevant's Estate,* supra, 92 Or. 269, 287, 178 P. 192. The proof here was considerably more than merely formal. It showed that the will was read to the testatrix, paragraph by paragraph, both in English and in Norwegian, in the presence of the subscribing witnesses, and that she expressed her understanding and approval thereof. Such method of proof was very proper in view of the testatrix's age and infirm condition. *Pickett's Will,* supra, at p. 141.

■ The testimony of the subscribing witnesses, Mr. Levenson and Mrs. Edmonds, if accepted as true, clearly indicates that at the time when she gave her instructions regarding the drafting of the will, and when she executed it, Mrs. Andersen was fully aware of what she was doing, of the nature and extent of her property, and of the persons who were the natural objects of her bounty. Mr. Levenson is an attorney at law in good standing. At the time when he witnessed Mrs. Andersen's will he had been practicing in Port-

land for about a quarter of a century. His character and credibility were not impeached in any respect whatever. Indeed, upon the oral argument, counsel for contestants stated specifically that they were not attacking Mr. Levenson's credibility. The mere fact that he was the person who, as testatrix's attorney, drafted the will, did not in any manner disqualify him from acting as a witness thereto. *In re Estate of Meier,* 190 Or. 140, 224 P. 2d 572, 575. Mrs. Edmonds was evidently a completely disinterested witness, who had not previously been acquainted with any of the persons involved. No reason is apparent from the evidence to indicate that Miss Shuholm, one of the chief actors in the transaction, and the person who secured the services of Mr. Levenson for Mrs. Andersen, was not completely disinterested. Her only connection with Mrs. Andersen was one of good-hearted friendship. According to Mr. Levenson's testimony, Mrs. Amundson took very little part in the general discussion and none at all in connection with the preparation or execution of the will.

The most important witness on the part of the contestants in this connection was Mrs. Mettie Yarbrough, who occupied one of the beds in the same ward as Mrs. Andersen's during the time when the events which we have been discussing took place. She testified that there were four beds in the ward, two on either side. Mrs. Andersen was in the bed immediately to the left of the door, and Mrs. Yarbrough's bed was diagonally opposite. There was a distance of about 15 feet between the two beds. On the day on which the will was executed, Mrs. Amundson visited Mrs. Andersen several times, and twice reminded her that she wanted to make a will. At about three o'clock in the afternoon, Mrs.

Amundson mentioned to Mrs. Andersen different things that were supposed to be put in the will, but Mrs. Yarbrough did not hear Mrs. Andersen make any response. In the evening, Mr. Levenson came with Mrs. Amundson and Miss Shuholm, and they talked over the will. Mrs. Amundson did most of the talking. They were there approximately three-quarters of an hour. Mrs. Yarbrough did not hear any audible words spoken by Mrs. Andersen. The conversation was between Mrs. Amundson, Miss Shuholm and Mr. Levenson. With reference to the disposition of the property, Mrs. Amundson made most of the remarks, saying, in effect, that she remembered that Mrs. Andersen had said she wanted such and such property left to so and so. After Mr. Levenson and the two women left, the nurse came in and made Mrs. Andersen comfortable for the night. They turned the light off, but Mrs. Andersen made some kind of grunting sound, and the nurse asked if she wanted the light on, and "they" turned it back on. Mr. Levenson and the two women came back close to 11 o'clock.

"A. * * * Minnie [Mrs. Amundson] came in, and Evelyn came in first. They told the nurses they were supposed to have Mrs. Andersen awake so that she could sign her will, and the nurse made an awful fuss about it, because it was after hours. She was afraid of waking the other patients, who were fairly sick, but she insisted, and they got the lawyer. The lawyer came in then, and then they had to go out to get someone to be a witness, and they were gone for a little while, and they came back in with this lady up here, Mrs. Nellie Edmonds, or something of the sort.

"Q. Then, after Nellie Edmonds, the lawyer, Minnie and Evelyn were all in the room, did you observe what went on then? A. Yes; one of them said, 'We have a will made as you wanted it made,

and do you want it read?' and there was no answer. The will was not read.

"Q. You observed everything that went on there, and did not hear the will read? A. I did not hear anything that even sounded like a will.

"Q. What did they do as regarding getting the will signed? A. They went out to get some kind of board to put under Mrs. Andersen's hand so that she could sign it.

"Q. How long were they in there? A. Approximately fifteen minutes, no longer, because the girl had to get back to the switchboard. I heard her say so."

Continuing, Mrs. Yarbrough testified that Mrs. Andersen did not take part in any of the general conversation on the occasion of Mr. Levenson's first visit. Mr. Levenson himself did not say much of anything. Mrs. Amundson talked about Mrs. Andersen's cats, and this and that, her household affairs, and what she had done for the cats; that she had taken care of them so Mrs. Andersen wouldn't worry about them. Miss Shuholm didn't say much. Mr. Levenson didn't ask Mrs. Andersen any questions whatever about the will. He did say he came to make the will for her. Mrs. Amundson did the talking, and she said she had the notes all made for them "just as Aunt Randi wanted them." Mrs. Amundson had some notes in her hand, and she kept them in her hand until she handed them to the lawyer.

"A. She handed a package to the lawyer that consisted of papers and some money. Whether she had the notes with them at that time I do not know, but I believe either she took them with her to do some work on them or she handed them to him. "* * *

"Q. Did you see anybody making any notes

there that night? A. I believe Evelyn had a pad and pencil in her hand.

"Q. What was she doing? A. She could have been writing.

"* * *

"Q. Your testimony is that Randi Andersen, during that time, never said anything? A. I didn't hear her say anything.

"Q. Would you say that she did or didn't? A. I said I didn't hear. I don't know whether she did or did not. I didn't hear it."

We are at a loss to account for the direct and positive conflict between the testimony of Mr. Levenson and Mrs. Edmonds on the one hand and that of Mrs. Yarbrough on the other. The conflict was absolute, and the chancellor was obliged to resolve it upon consideration of all the evidence and of the appearance and demeanor of the respective witnesses. There was evidence that the curtains around Mrs. Andersen's bed were at least partially drawn. Mrs. Yarbrough testified that she had been unable to sleep on the occasion, and that she was wide awake during the two visits of Mr. Levenson to the hospital, but perhaps she was not so wakeful as she thinks she was. At all events, we find ourselves unable to discount the effect of the positive testimony of Mr. Levenson and Mrs. Edmonds, the subscribing witnesses, and we agree with the chancellor in giving greater weight to their testimony than to that of Mrs. Yarbrough.

■ The testimony of the subscribing witnesses in support of the mental competency of the testatrix is entitled to great weight, and, according to some of the authorities, entitled to greater weight than that of non-subscribing witnesses. It is aided by the presumption of competency which follows proof of due execution of the will. Annotation, 123 A.L.R. 89; *Clark v. Ellis,* supra,

9 Or. 128, 147; *In re Will of Robert Carr*, 121 Or. 574, 580, 256 P. 390; *Morley v. Silverton Hospital*, 138 Or. 75, 95, 5 P. 2d 92; *McGreal v. Culhane*, 172 Or. 337, 341, 141 P. 2d 828; *In re Walther's Estate*, supra, 177 Or. 382, 401, 163 P. 2d 285.

As to the testimony of the doctors and the nurses, our acceptance of the testimony of the subscribing witnesses obliges us to conclude that, while Mrs. Andersen was a very sick woman, she had, during the evening, rallied enough from her condition earlier in the day so that she had sufficient understanding to enable her to comprehend the business about which she was engaged. She had borne in mind the fact that she had a brother, John Ronning, from whom she had not heard for more than 30 years. She named him in her will, but made no provision for him. She bequeathed to each of the contestants the sum of $300, describing them as her nephew and niece respectively. There is no evidence that contestants had paid any particular attention to Mrs. Andersen in her lifetime, or that they had any reason to consider themselves the natural objects of her bounty other than the mere fact of collateral relationship. On the other hand, as Mr. Levenson testified, Mrs. Andersen told him that the Andersen family had been kinder to her than her own relatives.

■ In this connection we reiterate what we have frequently said, that in cases of this character the findings of the trial judge who had the advantage of seeing and hearing the witnesses are strongly persuasive. *Morley v. Silverton Hospital*, supra, 138 Or. 75, 95, 5 P. 2d 92; *In re Murray's Estate*, supra, 173 Or. 209, 227, 144 P. 2d 1016; *In re Provolt's Estate*, supra, 175 Or. 128, 135, 151 P. 2d 736; *In re Southman's Estate*, 178 Or. 462, 483, 168 P. 2d 572.

This court, in *Chrisman v. Chrisman,* 16 Or. 127, 136, 18 P. 6, said:

" 'The phrase "sound mind," ' said Sir James Hanner, 'covers the whole subject, but emphasis is laid upon two particular functions of mind which must be sound in order to create capacity for the making of a will, for there must be memory to recall the several persons who may be supposed to be in such a position as to become the fitting objects of the testator's bounty; above all, there must be understanding to comprehend their relations to himself, and their claims upon him.' (Broughton v. Knight, Law R. 3 Pro. & D. 64; 6 Moak E.R. 350.) This probably is about as correct a definition of the law as any given, but it is merely a reiteration in a different phrase of what has been repeatedly expressed by other judges. * * *"

Tested by the foregoing, we are of the opinion that the evidence established that Mrs. Andersen, when she executed the will in controversy, had testamentary capacity, notwithstanding her advanced years and the illness from which she was suffering. *In re Bond's Estate,* 172 Or. 509, 520, 143 P. 2d 244; *In re Davis' Will,* 172 Or. 354, 370, 142 P. 2d 143; *Chrisman v. Chrisman,* supra, at p. 138; *Ames' Will,* 40 Or. 495, 504, 67 P. 737; *In re Walther's Estate,* supra, 177 Or. 382, 388, 163 P. 2d 285; *In re Sturtevant's Estate,* supra, 92 Or. 269, 300, 178 P. 192; *McGreal v. Culhane,* 172 Or. 337, 343, 141 P. 2d 828.

■ We do not find that there was proof of the existence of a fiduciary relationship between the testatrix and Mrs. Amundson. No doubt they were intimate friends, and probably their relationship was sufficiently close to have been regarded as confidential. *In re Knutson's Estate,* 149 Or. 467, 488, 41 P. 2d 793. However, there is no proof whatever, in our estimation,

that Mrs. Amundson took undue advantage of the relationship, or exercised any influence whatever in the disposition which testatrix's will made of her property. It is true that Mrs. Amundson was assiduous in her attentions to testatrix in her illness, but the mere kindly attentions of a close friend are not undue influence.

The burden of proving undue influence is usually upon the party who asserts it. *Wayne v. Huber,* 134 Or. 464, 470, 291 P. 356, 294 P. 590, 79 A.L.R. 1427; *In re Southman's Estate,* supra, 178 Or. 462, 482, 168 P. 2d 572. Where, however, a fiduciary or confidential relationship exists between testator and beneficiary, and there is proof that the beneficiary was actively concerned with the preparation of the will, then the beneficiary is required to produce evidence sufficient to establish that no undue influence was in fact exerted. *Allen v. Breding,* 181 Or. 332, 341, 181 P. 2d 783; *In re Knutson's Will,* supra, 149 Or. 467, 488, 41 P. 2d 793. There was testimony by Mrs. Yarbrough, as has been stated, to the effect that Mrs. Amundson made certain suggestions to testatrix with respect to matters which should be in the will, but we think that this testimony is entitled to little weight. There was nothing in the evidence, in our opinion, to indicate that the testatrix was in any respect deprived of the free exercise of her own judgment in the premises. *Evans v. Anderson,* 186 Or. 443, 470, 207 P. 2d 165; *In re Will of Robert Carr,* supra, 121 Or. 574, 581, 256 P. 390; *Allen v. Breding,* supra, at p. 343.

Moreover, as we have said, there was no showing, apart from their relationship, that the contestants were the natural objects of the testatrix's bounty. We think, therefore, that the fact that contestants received only minor legacies did not tend to show that the will

was an unnatural one. *Talbert v. Skilbred,* supra, 125 Or. 545, 551, 267 P. 396; *In re Walther's Estate,* supra, 177 Or. 382, 397, 163 P. 2d 285; *Allen v. Breding,* supra, at p. 343.

Motive and opportunity for the exercise of undue influence are not enough. There must be proof that undue influence actually was exercised. *Rice v. Rice,* 95 Or. 559, 563, 188 P. 181; *In re Will of Robert Carr,* supra, 121 Or. 574, 581, 256 P. 390; *In re Lobb's Will,* 177 Or. 162, 185, 160 P. 2d 295. The facts that Mrs. Amundson accompanied Mr. Levenson and Miss Shuholm to Mrs. Andersen's home, where Mr. Levenson secured data to assist him in drawing the will, and thereafter continued with them to Mr. Levenson's office where he dictated the will to Miss Shuholm, and returned with them to the hospital with the will after it had been typed, and was present when the will was executed, are not necessarily proof of undue influence, in the absence of any showing that Mrs. Amundson took an active part in the preparation of the will. *In re Estate of Meier,* supra, 190 Or. 140, 224 P. 2d 572, 577. These are matters for consideration upon the question of undue influence, but are not controlling. *In re Southman's Estate,* supra, 178 Or. 462, 483, 168 P. 2d 572; *In re Knutson's Estate,* supra, 149 Or. 467, 476, 495, 41 P. 2d 793. More particularly is this true when the will is prepared by a disinterested person and executed in the presence of disinterested witnesses, as was the case here. *In re Faling's Will,* 105 Or. 365, 450, 208 P. 715. Obviously there was considerable esteem and affection between the testatrix and Mrs. Amundson. Influence arising from such is not undue. *In re Darst's Will,* 34 Or. 58, 65, 54 P. 947; *Holman's Will,* supra, 42 Or. 345, 358, 70 P. 908; *Evans*

*v. Anderson,* supra, 186 Or. 443, 470, 207 P. 2d 165. According to Mr. Levenson's testimony, the only time when Mrs. Amundson joined in the conversation regarding the will was when Mrs. Andersen stated to Miss Shuholm that she desired to have the residue of her estate go to Mrs. Amundson and her husband, whereupon Mrs. Amundson said: "You don't have to do that, Randi," and Mrs. Andersen answered: "You've been good to me, and I want you to have whatever I leave."

In *Newman v. Stover,* 187 Or. 641, 213 P. 2d 137, which was a will contest case, the suit was dismissed on motion of the proponent of the will after the contestant had rested his case. We held such dismissal to have been error. Although the trial court felt that the evidence on the part of contestant was insufficient to sustain the charge of undue influence, it was, in our opinion, sufficient to make a prima facie case. In our view, the proponent should have been given an opportunity to meet such evidence, or, at the least, should have been required to rest his case before the court passed upon the motion to dismiss, to the end that the court's decision might operate as res judicata. On the authority of *Orsen v. Siegle,* 170 Or. 153, 169, 132 P. 2d 409, therefore, the case was remanded for further proceedings. *Orsen v. Siegle* was a suit to set aside a conveyance of land as in fraud of creditors. In the lower court the case was dismissed with prejudice, without the court having required any proof by defendants, although this court held on appeal that this was error, and that, on the record as it stood, plaintiff should have prevailed and the deed should have been set aside. In the case at bar, on the contrary, the contestants, who had the burden of proof of undue

influence, had submitted all their evidence and had failed to sustain such burden. Nothing would be gained by remanding the case under such circumstances. The proponent sufficiently established the testamentary capacity of the testatrix, as to which she had the burden of proof. The contestants having failed to sustain the burden of proof of undue influence, a motion to dismiss on the ground of failure of proof was proper under the statute. § 9-208, O.C.L.A.; *Haney v. Parkison,* 72 Or. 249, 254, 143 P. 926, Ann. Cas. 1916D 1035. While, as stated in *Newman v. Stover,* supra, 187 Or. 641, 645, 213 P. 2d 137: "Ordinarily, it is bad practice in equity for a defendant to move for a dismissal at the conclusion of the plaintiff's case," the statute permits such practice where the party having the burden of proof fails to make a prima facie case.

We have considered the able and spirited dissenting opinion of Mr. Justice WARNER. We think it tends to evaluate too highly the weight to be given the testimony of physicians and nurses as against the testimony of laymen under circumstances such as those in this case. It is true that no rebuttal evidence was offered against the professional testimony, but, if the lay witnesses were telling the truth as to what happened in connection with the drafting and execution of the will, no rebuttal testimony was needed.

The dissenting opinion suggests that the fact that Miss Shuholm and Mrs. Amundson did not testify is a circumstance weakening proponents' case. It would, perhaps, have been better trial tactics for them to have testified, but Miss Shuholm and Mrs. Amundson were entitled to the benefit of the testimony of Mr. Levenson and Mrs. Edmonds, and to rest upon that alone if

they saw fit. The dissenting opinion speaks of "the proponents", but there was only one proponent, Miss Shuholm, who benefited by the will only to the extent of a token bequest of $100, and against whom nothing improper has been suggested.

The advanced age and critical condition of Mrs. Andersen at the time when she executed the will were the things upon which, in the main, the physicians based their opinion that she lacked testamentary capacity, but the probative force of their opinion evidence in this regard was, we think, overcome by the testimony of the witnesses to the will, assuming the latter to have been worthy of belief. Cf. *McCracken v. McCracken,* 109 Or. 83, 86, 219 P. 196.

If the opinion evidence of physicians in such cases is to be permitted to outweigh emphatic and circumstantial testimony of reliable lay witnesses to facts which, under our decisions, have always been held to demonstrate testamentary capacity, a new rule will have been established in Oregon. The intelligent and detailed manner in which Mrs. Andersen described her property and the persons to whom she wished to devise and bequeath it surely cannot be brushed aside as a mere "superficial manifestation of rationality"! Illustrations of what a person under hypnotic control may be induced to do (a matter respecting which there is no evidence in the case) would appear to be quite irrelevant.

The law does indeed require that a mentally ill person be examined by competent physicians before he is committed to the state hospital as insane. The physicians, having examined the supposedly insane person, merely report to the probate court in writing, under oath but ex parte, their verified findings that such

person is mentally ill and in need of treatment, care or custody. Ch. 571, Oregon Laws 1949, § 4. The person under examination is entitled to be represented by counsel, and other "competent evidence" than the ex parte report of the physicians may be offered and must be considered. Idem. The statute, in this connection, may be, as the dissenting opinion intimates, "a positive recognition of the value of scientific disclosures", but the law respects the rights of persons, and permits even an insane person, during a lucid interval, to make a valid will.

In *Snyder v. De Remer*, 143 Or. 414, 22 P. 2d 877, the testatrix had chronic bronchitis and arteriosclerosis. Shortly before she executed her will, she had been quite ill with influenza, was coughing badly, and was delirious, but there was evidence that she had recovered from that illness. She was 84 years old, and a guardian had been appointed for her. It was shown, by the testimony of a reputable attorney, Mr. Vinton, who drew her will, that, without reference to any memorandum, testatrix told him the names and places of residence of her nephews and nieces; stated that she had given one of them $2,000 a few months before, and that therefore she was bequeathing him only one dollar; and said that she wished to be buried beside her husband. She desired that one particular nephew should be named as executor, but, on being advised that he would be disqualified by reason of nonresidence, named another person in his stead. The will was upheld by this court as against an attack based upon asserted lack of testamentary capacity. We think that, in comparison with the evidence in that case, the evidence here fully demonstrated the testamentary capacity of the testatrix.

We do not in the least depreciate the testimony of professional witnesses. We say only that, as Dr. Belknap conceded, if the testimony of the subscribing witnesses was true, then the testatrix, notwithstanding her age and critical condition of illness, had testamentary capacity when she executed her will. Rejection of the testimony of the subscribing witnesses in this case, and adoption of the opinion testimony of the professional witnesses as conclusive, would indeed be giving to the latter a "dignity and persuasiveness" to which, *in this case,* it is not entitled.

We are of the opinion that the case was correctly decided. The decree is affirmed. No costs to any party.

WARNER, J., dissenting.

In my opinion the preponderance of the evidence discloses a want of testamentary capacity in the decedent at the time of the execution of the will. I feel the majority opinion gives too great weight to the testimony of the two attesting witnesses and too little to that coming from the physicians who served the decedent in her last illness and the corroboration supplied by the hospital nurses and hospital records. It ignores the rule "that *clear and convincing* proof is required of the proponents as to the testamentary capacity of the testatrix in order to uphold the will in question." (Italics mine.) *Snyder v. De Remer,* 143 Or. 414, 417, 22 P. 2d 877. Also see *In re Johnson's Estate,* 162 Or. 97, 91 P. 2d 330.

The proponents rested their case exclusively upon the testimony of the will's attesting witnesses, both laymen. The contestants depended entirely upon the testimony of seven persons, i.e., the two doctors charged with Mrs. Andersen's care while she was in Providence

Hospital; three nurses attached to the staff of that hospital who had varying degrees of professional responsibility in her case during her confinement there; Dr. Leland V. Belknap called as an expert; and a Mrs. Yarbrough, who was a patient in the same room with Mrs. Andersen from the date of her entry and up to and including the time she executed the will. Every witness called by either side was disinterested. The motives of none can be impugned. Not one of them ever knew Mrs. Andersen prior to the day she entered the hospital. All the evidence is predicated upon observations made within the walls of that institution, except for the short time Dr. Amato first examined her at her home in response to an emergency call. It was that examination which dictated the immediate hospitalization which followed the same day.

I think it is significantly noteworthy that the proponents did not offer one iota of testimony in rebuttal. The evidence coming from contestants' witnesses stands uncontradicted and the medical testimony unchallenged. This sharp conflict left to the court no alternative but to decide whether it would predicate its judgment as to the testatrix' mental capacity solely upon the testimony of the two attesting witnesses who were not trained in medicine or solely upon the uncontradicted scientific judgment of three doctors and three nurses.

I think it is also significant, in that state of the record, that the proponents did not call to the stand the two lay persons closest to Mrs. Andersen—who were her neighbors and friends during her later days and one or both of whom were with her most of the day upon which the will was executed; who were responsible for the retention of Mr. Levenson as her attorney;

who were present at his initial conference with decedent; who were at her bedside when she executed the will; who were beneficiaries under its provisions; and who were both in the courtroom at the time of the contest. I refer to Evelyn I. Shuholm, the executrix, who not only acted as Mrs. Andersen's interpreter during Mr. Levenson's interviews when Mrs. Andersen resorted to Norwegian but who also officiated as the attorney's secretary in taking notes of decedent's alleged directions. I also refer to Minnie Amundson, one of the residuary legatees. The stenographic record of Miss Shuholm was not even offered in evidence. As a result the testimony of the proponents is wanting in the qualities of clarity and conviction mandated by the law. *Snyder v. De Remer,* supra.

While the testimony of the attesting witnesses may seem to be "clear," yet it lost whatever "convincing" quality it had immediately upon the contestants' resting. The testimony of the contestants was of the type and weight that cast upon the proponents the duty and burden to overcome its devastating impact and restore the then missing element of conviction, if they were able to do so. I can only assume by their silence and failure to make rebuttal that they could not meet the challenge. Their quiescence at this juncture with their election to thus retire and rely upon technical legal rules to save their case from the weight of the medical evidence marks, in my opinion, the time and place of their complete frustration in this matter.

Mrs. Andersen was 85 years old at the time of her last illness. Her condition continued as extremely critical up to the time that she died, which was on April 2, 1949, four days after she had executed the will. When she first entered the hospital, she was in extremis

with all the signs or symptoms of acute heart failure and it was so bad, in fact, that the resident physician who received her testified that hers was one of the most severe cases of heart failure that he had ever seen. She was cyanotic and unable to move any part of her body except her head and right arm. Rubber tourniquets were applied to both arms and legs to make it as easy as possible for her heart to circulate the blood to her brain. She had extreme difficulty in breathing, so much so that oxygen was administered. She was still taking oxygen through tubes in her nose each time Mr. Levenson interviewed her. The resident physician tells us that she had a generalized arteriosclerosis which impaired the blood supply to the brain and that there was also a noticeable deterioration of kidney function. Part of her medication included hypodermic administrations of morphine at various times, including a dosage given about an hour and a half prior to the time that she executed the will. The doctors did not rest their determination of her mental capacity at the time of the will's signing alone in terms of her reaction to the morphine dosages but took into account her advanced years and other then evident physical disabilities. It was the considered judgment of the attending doctors and the hospital nurses who waited upon her that Mrs. Andersen did not have and could not have had testamentary capacity at the time she signed her will nor, indeed, at any time after she entered the hospital. One of the nurses solicited to act as a witness to the will's execution declined to do so for this reason.

Against this line of testimony from the mouths of these experienced and scientifically trained persons serving her as necessary during her hospitalization, we

have only the testimony of Mr. Levenson, the attorney who drew the will and who had never met Mrs. Andersen prior to the time he visited her at seven o'clock on the evening of March 29, and the testimony of the hospital telephone operator, who likewise never knew Mrs. Andersen until called to her room to act in the capacity of an attesting witness. Mrs. Edmonds' opportunities of observation were limited to approximately fifteen minutes.

Ordinarily, a rational statement betokens a rational and normal mind capable of making sound and intelligent judgments and expressing ideas with reference thereto in a sufficiently intelligent and coherent manner to be understood by the persons to whom such statements are addressed. It is one of the seemingly accurate criteria most frequently employed by laymen. But such a superficial manifestation of rationality is not always a true indication of a sound mind or free will. This is attested by a variety of human experiences. By way of illustration: A person under hypnotic control may be induced to make what may appear to be intelligent and rational statements but which, nevertheless, are not indicative of the true will of the speaker and which, indeed, may even convey ideas and opinions diametrically opposed to those that he would express or entertain when released from the hypnosis. Although there is no suggestion in this matter that Mrs. Andersen was the subject of hypnosis, and, of course, she was not, the evidence is clear and uncontradicted that her condition dictated the administration of morphine, a potent narcotic. It is a matter of common knowledge that certain drugs, particularly in the narcotic category, sometimes induce a change of character and departure from normal habits of think-

ing and expression without necessarily destroying the power of making what might appear to another as a clear and rational statement. The reactions to the stimulus of a given dosage of morphine are not always the same upon all people. Indeed, we learn from the doctors that due consideration must be given to the age and physical condition of the patient, and that precise thing was done in this instance when they evaluated the effect of the narcotic on the mental capacity of the decedent. Even if Mrs. Andersen had made the various statements and had supplied the information testified to by the attesting witnesses, it does not follow in her case that this surface and visible show of apparent mental lucidity did, in fact, connote testamentary capacity or necessarily demonstrate that she even knew what she was then saying or that she would have any memory of it in any following lucid interval.

The statutory proceeding to commit an insane person is not in all things exactly analogous to the determination of the mental capacity of a testator as of the moment he executes a will. The former presumes the presence of a continuing state of mental illness. The latter presumes a continuing capacity or, if the testator's mental capacity is challenged in a will contest, that he was mentally competent or, if not mentally competent, that he had what the law calls a "lucid interval" at the time. Both proceedings have the fundamentally common element of requiring a judicial determination of mental status or mental capacity of a given person as of a given time and, therefore, should basically observe the same evidentiary standards in the search for a correct answer.

The determination in a commitment proceeding is predicated upon a positive recognition of the value

of scientific disclosures. It mandates a finding by doctors that a party is mentally ill as a condition precedent to any order of commitment (chapter 571, Oregon Laws 1949). That law is a legislative recognition of the importance of medical testimony in matters where the status of so delicate a thing as mentality is concerned. It is a species of public acknowledgment that those properly trained in the great art of medicine are better equipped to say who is or who is not mentally competent than is a lay observer, no matter how disinterested or how well otherwise educated that lay observer may be. It is a law modern in its concept and enlightened in its appreciation of medical progress and training with its more exact and convincing tests of mental capacity than are many of the rules of probate law conceived in days of antiquity and too often presently applied.

Here, however, in a proceeding to evaluate the testatrix' mental capacity, i.e., to assure ourselves that she had the necessary comprehension, reason, memory and understanding sufficient to do a legal act, the majority of the court relies exclusively upon an old rule and takes no account of the statements coming from those with a medical background. I refer to the rule which gives "great weight" to the testimony of attesting witnesses. This rule giving importance to such testimony was first written into the body of the law of the state seventy years ago by Mr. Justice LORD in *Clark v. Ellis*, 9 Or. 128, 147. But he did not then employ the word "great" nor "much" but rather rested his conclusion upon the quoted statement from *Stevens v. Vancleve*, 4 Wash. C.C.R., reading:

"The evidence of the attesting witnesses, and next to them, of those who were present at the

execution, *all other things being equal,* are most to be relied upon." (Italics mine.)

Subsequently this court has variously expanded the rule predicated upon that holding to read "great weight," or as in *Morley v. Silverton Hospital,* 138 Or. 75, 95, 5 P. 2d 92, "much weight." The effect of the majority opinion in this matter is to give such lay testimony not just "much weight" or "great weight" but to give it the status of greater weight than uncontradicted and unchallenged medical testimony coming from a host of scientifically trained observers and to apply it in the face of a situation wherein it cannot be said "all other things being equal." *Clark v. Ellis,* supra. The majority opinion projects a sort of legal anomaly in the jurisprudence of the state by the secondary place it here gives to medical judgment, which I think should be and can be avoided in this matter.

The only justification which can be suggested in this case for the reversal of the application of the proper respect for medical testimony accorded by statute in a commitment proceeding and that given by the majority opinion is that the attorney and the telephone operator were actually present at the moment when, as they alone testify, the decedent executed her will and that the doctors and nurses were not in similar proximity to the decedent at the same time. But the so-called advantages growing from momentary propinquity to the testatrix by her attesting witnesses are weakened when we recall that the opinion of the attorney who drew the will as to the decedent's testamentary capacity rests upon a forty-five-minute conversation with her on the occasion of their first meeting, at a time when she was in extremis and when her speech, alternating between Norwegian and English, was handi-

capped by the presence of rubber tubes in her nostrils conveying needed oxygen. Testimony of attesting witnesses to the competency of a testator may be overcome by competent evidence, circumstantial or direct, notwithstanding that it does not cover *the particular day* the will was executed if it does cover a reasonable time before and after that day. *In re Murray's Estate,* 173 Or. 209, 227, 144 P. 2d 1016.

The testimony of the attesting witnesses is further weakened when we know, as we do, that the telephone operator's entire acquaintance with the testatrix is encompassed by the fifteen-minute period when she was in her presence for the sole purpose of acting as a witness to the execution of Mrs. Andersen's will. As between the hospital's trained nurse who refused to act as a witness because she did not think Mrs. Andersen was mentally competent and the observations of the hospital telephone operator concerning the testatrix' mental competency, predicated solely upon what she heard Mrs. Andersen say within the limited time she was in Mrs. Andersen's room, I choose to give the greater weight to that of the nurse. As between the testimony of the doctors and nurses who attended her in the hospital and the want of training and superficial observations of the attesting witnesses garnered within a short space of time and in an atmosphere of trying circumstances, I prefer to accept the judgment of those skilled in medical science that Mrs. Andersen's advanced age and deteriorated physical condition, such as it was at the time, plus the factor of narcotic medication administered but a short time before the will's signing, rendered her mentally incompetent to execute such a document, and this notwithstanding any legal formula to the contrary.

This court cannot, of course, change the commitment law to conform to its ideas as to tests of mental competency, as reflected by the majority opinion. This court can, however, and in the opinion of the writer should, when presented with an opportunity, such as is afforded by the facts in the instant case, give the professional testimony the place of dignity and persuasiveness that I think it is entitled to receive in a matter of this kind under the circumstances here presented and thus bring us more into harmony with the spirit of the legislature's recognition of the relative importance and skill of the medical profession when the mental capacity of a person is challenged in a commitment proceeding (chapter 571, Oregon Laws 1949). Justice demands that our fidelity to such an ancient rule as is the one applied in the majority opinion for testing a testator's testamentary capacity through the voice of attesting witnesses should not become so inflexible that we decline to recognize and apply on appropriate occasions when available, as here, the more modern and superior knowledge of the medical profession.

When a court has the opportunity to listen to equally disinterested witnesses who have the training which enables them to look beyond the testatrix' spoken word and describe and evaluate the mental processes which are responsible for its utterance and to dogmatically assert that such spoken words, no matter how apparently rational they may sound to a lay person, do not reflect the normal or true ideas of the speaker at the moment, then the testimony of the attesting witnesses should give way to the experienced professional judgment.

My conclusions above rest solely upon the facts revealed by the record in this cause. I have no desire

nor intention to here indicate approval of a rule which would uniformly give a preferred status to medical testimony, according greater weight to it than to testimony adduced by lay witnesses in matters where mental capacity is the subject of challenge; but here the situation is unique and its very novelty commands appropriate recognition.

The lower court should be reversed.

LATOURETTE, J., dissenting.

I would add to the dissent of Mr. Justice WARNER, with which I agree in the main, that in evaluating the testimony of the attorney who drew and attested the will and who is probating the same on the one side, and the doctors' and nurses' testimony on the other side, to determine where the weight of the testimony lies, one must not forget that the contestants' witnesses have no interest whatsoever in the outcome of the case, while the attorney for proponents is interested to the extent that he naturally wants his midnight will upheld and his attorney's fee in probate assured, nor must we forget that the attorney is hard of hearing, and that the discussion was partly in Norwegian with which the attorney was not familiar. I do not say these things in any disparaging manner, but merely mention them so that the human element will not be overlooked. This is a case where we must weigh the evidence and find where it preponderates. It is not a question of who is prevaricating.

It further occurs to me that the majority opinion in this case overemphasizes the value of the testimony of the attorney who attested the will, and the telephone operator, both of whom were strangers to the decedent. The telephone operator's opportunity to appraise the

testamentary capacity of testatrix covered a period of only 15 minutes. She testified that a general conversation was taking place and that she did not pay much attention. Hardly a dozen words were spoken to her by testatrix.

Concerning what occurred at the execution of the will, I will narrate the attorney's testimony as gathered from the majority opinion.

When Mr. Levenson arrived at the hospital between 10:30 and 11 o'clock in the evening, he told Mrs. Andersen that he had the papers with him but that they would have to obtain witnesses. He said he could act as one, and Mrs. Andersen inquired if Miss Shuholm could not act as a witness. Upon being told that she could not, he then brought in a Mrs Edmonds, the telephone operator, and then Miss Shuholm read the will to Mrs. Andersen paragraph by paragraph, first in English and then in Norwegian. After each paragraph had been read in English, Miss Shuholm asked Mrs. Andersen in Norwegian if she understood it, and Mrs. Andersen each time responded, "Ja, that's what I want; that's what I want." Mr. Levenson then asked Mrs. Andersen if she wanted him to witness the will, to which she replied, "Ja." Mrs. Andersen then signed the will and asked Mrs. Edmonds and him to witness it. They affixed their signatures as witnesses, and Mrs. Andersen then said, "Well, I feel much better now." (How Mr. Levenson would know that Miss Shuholm read the will paragraph by paragraph and asked Mrs. Andersen in Norwegian if she understood it, I am unable to fully comprehend, since he testified that he did not understand Norwegian. This certainly has some bearing on his credibility.)

In the instant case, the execution of the will con-

sumed approximately 15 minutes of time; testatrix was under an opiate and what occurred during that period was so meager that the attesting witnesses did not have much material on which to base their testimony as to her mental capabilities.

Under § 2-228, O.C.L.A., a witness has the right to testify on a question of "science, art, or trade, when he is skilled therein," and the opinion of a subscribing witness to a writing may be given when the validity of the writing is in dispute "respecting the mental sanity of the signer, and the opinion of an intimate acquaintance respecting the mental sanity of a person, the reason for the opinion being given."

As to the mental capacity of testatrix, it appears to me from reading the majority opinion that the same is based primarily on the testimony of the attorney relating to what happened during the 45 minutes he was with the testatrix early in the evening. The opinion of the attorney formed during this period does not rest on the same footing as that of the doctors and nurses as they have a statutory preference, being skilled in their respective professions. In 57 Am. Jur., Wills, 124, § 131, we find the following language:

"* * * The opinion of an attesting witness, formed at another time, before or after the execution of the will, stands like that of any other witness and is not admissible unless the facts upon which the opinion is based are in evidence." See *Williams v. Spencer*, 150 Mass. 346, 23 N.E. 105, 5 L.R.A. 790, 15 Am. St. Rep. 206.

It is doubtful that the attorney, not having been an intimate acquaintance of testatrix, would be allowed to give his opinion as to her mental condition based on what occurred at the seven o'clock meeting at the hospital, since the sanity of the testatrix was the ulti-

mate question for the court to determine and could not be testified to, the testimony of the subscribing witness being limited to the occasion of the execution of the will.

In a number of places in the attorney's testimony referring to the seven o'clock hospital meeting, he drew his conclusions concerning decedent's mental condition, some of which are the following: That she was "fully competent"; that "I wanted to first determine for myself that I was dealing with a person who had intelligence. I've been practicing law long enough to know that the execution of a will requires competency, and I wasn't going to draft a will for a person whom I didn't believe was capable of signing and understanding a will."

In answer to the question, "Now, Mr. Levenson, what did you observe about Randi Andersen, when you saw her, as to her mental condition [referring to the first meeting]?" propounded by the attorney, Mr. Levenson replied: "Mentally she was alert; her eyes were keen; she had a good grip in her hand, a warm grip in her hand; she shook hands with me when I was there at seven o'clock; her mind functioned well; she answered questions without any hesitancy; her conversation that was going on was intelligent; her answers were intelligent; she smiled when we brought up something that was interesting to her."

In reply to the question, "And would you say that *at the time of the drafting, or the dictation for the drafting*, and at the time of the reading and the execution of the will, that Randi Andersen knew the nature and extent of her property?" Mr. Levenson said, "She most assuredly did." (Italics mine.)

It will be observed that there was no objection to

this line of testimony, and, for that reason, it might be argued that it would have probative value. This may be true but the weight of such testimony, in my opinion, would not measure up to that of the testimony of the doctors and nurses.

We then have a lay witness' testimony improperly received lined up against that of three doctors and three nurses. I prefer to accept the testimony of the preferential witnesses.

In *Chrisman v. Chrisman,* 16 Or. 127, 18 P. 6, 12, we said:

> " * * * Hence great weight is attached to the testimony of subscribing witnesses; for they have the opportunity to observe the mental condition, and all the circumstances surrounding the execution of the will. * * * *But the final decision of the case does not depend on them, but upon all the evidence adduced.*" (Italics mine.)

The reason then for the sanctity of the testimony of the attesting witnesses is that they have an opportunity *at the time of the execution of the will* to observe the testator's mental condition, and where they have small opportunity, as in the case at bar, to observe the testatrix' mental condition, their evidence is entitled to little weight.

I have taken opportunity to investigate a few, but not all, of the previous cases decided by this court where the testimony of the subscribing witnesses was given very little credence. I refer first to *In re Faling's Will,* 105 Or. 365, 208 P. 715, where this court disregarded the testimony of the subscribing witnesses and accepted the testimony of contestants' witnesses, the weight being with the latter.

In *In re Johnson's Estate,* 162 Or. 97, 91 P. 2d 330, this court, speaking through Mr. Justice BAILEY, re-

fused to uphold the will on the testimony of the attesting witnesses, one of whom was an attorney and the other a stenographer in the attorney's office. In that case there were other witnesses supporting the mental capacity of the testatrix; however, on the contestants' side, among other witnesses, were a doctor and two nurses.

This court, in *In re Murray's Estate,* 173 Or. 209, 144 P. 2d 1016, speaking through Mr. Justice BRAND, affirmed the writer who at that time occupied the trial bench and gave small weight to the testimony of the attorney, a subscribing witness to the will, and his secretary, who also witnessed the will, both of whom were well acquainted with the testatrix. In that case the pendulum swung in favor of the contestants upon lay testimony and upon the testimony of a medical doctor who had known the decedent but testified only as an expert witness.

It is interesting to note that in the Murray case the proponents of the will rested, as did the proponents in the instant case, on the testimony of the subscribing witnesses to the will.

In *Legler v. Legler,* 187 Or. 273, 211 P. 2d 233, this court, speaking through Mr. Justice ROSSMAN, did not take much stock in the testimony of an attorney who was a subscribing witness and held that Mr. Legler was mentally incompetent.

I mention the above cases merely for the purpose of emphasizing that we have not always placed a halo around the head of a subscribing witness, whether he be layman or attorney, and that the testimony of a subscribing witness to an instrument is entitled to great weight only where the circumstances justify it. So, when we lay down a fixed rule that "The testi-

mony of the subscribing witnesses in support of the mental competency of the testatrix is entitled to great weight,'' such rule should be qualified to the extent that such weight should not be so great as to emasculate the preponderance of evidence rule. I therefore dissent.